107 N.J. Super. 47 (1969)
256 A.2d 803
MEDIVOX PRODUCTIONS, INC., PLAINTIFF,
v.
HOFFMANN-LaROCHE, INC., DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 25, 1969.
*52 Mr. Robert P. Gorman for plaintiff (Messrs. Clapp & Eisenberg, attorneys).
*53 Mr. Richard M. Goldman for defendant (Messrs. Stein, Bliablias and Goldman, attorneys).
HANDLER, J.S.C.
Medivox Productions, Inc (hereinafter Medivox) entered into a contract on May 28, 1964 with defendant Hoffmann-LaRoche, Inc. (hereinafter Roche) for the production of a series of radio programs called "Milestones of Medicine." Medivox is a New York corporation whose principals are John Scott, a well-known broadcaster for New York radio station WOR, Edythe Scott, his wife, and Howard Greene. Roche is a leading manufacturer and distributor of pharmaceutical products. This was a promotional contract calling for 260 radio programs involving short dramatic episodes based on events in medical history, narrated by John Scott and broadcast by radio stations throughout the country on a daily basis; the programs, each with a "credit line" mentioning Roche, were to enhance in the public mind the image of persons and institutions connected with health and to underscore the importance of drugs. Scripts prepared by Medivox were to be submitted to Roche for its review and approval prior to broadcast. Medivox agreed to obtain radio stations to carry the program in designated retail drug marketing areas or cities throughout the country and guaranteed a specified amount of air-time.
The basic contract price was $140,000, to be paid in periodic installments over a period of one year. The broadcasts were initiated on June 22, 1964. On November 25, 1964, seven months before the end of the term, after Medivox had produced approximately 135 programs, Roche terminated the agreement. At this time it had paid Medivox $63,000 under the contract.
Medivox claims that it was performing in accordance with the terms of the contract and that Roche wrongfully terminated. It sues for the balance due as well as other consequential damages. Roche counters that in several respects Medivox was not fulfilling its obligations under the contract and that it was entitled to repudiate. By way of further defenses *54 and counterclaim for rescission and restitution, it asserts that Medivox committed fraudulent misrepresentations during both the negotiation and performance of the contract.

I
Roche claims that by November 25, 1964 Medivox had fallen so far short in terms of radio station coverage that it had materially breached the contract. The provisions of the contract which govern the obligations of the parties with respect to coverage are set forth in section 4, viz:
Scope of Broadcast-Medivox will make appropriate arrangements with radio stations and deliver such series of programs for broadcast on the basis, wherever possible, of one broadcast per day, five days per week, 52 weeks per year for a total of 260 programs per year on an exclusive broadcast basis with only one radio station in each of the designated marketing areas (as defined below) in the United States; this however shall not imply that a radio station shall be obtained in every designated marketing area.
Where a broadcast schedule as set forth above is not possible to arrange with a particular radio station, some other broadcast schedule may be followed.
The designated marketing areas shall consist of those top 200 cities and/or marketing areas in the United States selected on the dollar volume of retail drug sales encompassing approximately $6,000,000,000 or 73% of the national total as based on figures published in Standard Rate and Data Service, Inc. Spot Radio Rate and Data.
However, in those instances where broadcast areas as defined above overlap, the overlapped cities and/or marketing areas shall be considered a single unit and the list of cities and/or marketing areas as defined herein shall be extended by the same number of cities and/or marketing areas excluded in this manner so as to maintain a constant list of top 200 cities and/or marketing areas. * * *
There is a further provision in section 6 which states:
Medivox guarantees to Roche broadcast time during the year of one and one-half times the basic cost price of One Hundred Forty Thousand Dollars ($140,000.). For the purposes of this contract the value of the broadcast time of each program consisting of three minutes, forty-five seconds of editorial time that will actually be broadcast shall be based upon and equal to the prime one minute, one time spot rate of each station broadcasting `Milestones of Medicine' *55 as listed by the latest available Standard Rate and Data Service, Inc. Spot Radio Rate and Data and the Value of the total broadcast time shall be this figure times the number of broadcasts. In the event the broadcast time as above defined shall not be achieved, with appropriate adjustment, if any, for the medically significant areas referred to in paragraph 4, the cost to Roche shall be reduced in the same percentage proportion, and the obligation to Roche hereunder shall be on such reduced and prorated charge.
The written words of the contract define the parameters within which the understanding of the parties must be found.
While it is to be appreciated that the cardinal rule in the interpretation of contracts is to ascertain and effectuate the common intention of the parties, yet where the parties have composed a written memorial of their bargain, the intent that controls is that expressed or apparent in the writing. The parties are normally bound by the language employed regardless of some different intent or divergent understanding entertained by either party. Moscowitz v. Middlesex Borough B. & L. Ass'n, 18 N.J. Super. 182, 186 (App. Div. 1952).
Each party espouses a variant construction of these contract provisions based upon its own conception of their common intention. Medivox urges that paragraph 4 only prescribes the markets within which it had to solicit stations and not, as contended by Roche, a numerical guarantee of stations or markets.
Paragraph 4 on its face does not crystalize an affirmative duty on the part of Medivox to obtain a radio station in each of the designated marketing areas or to obtain any particular number of radio stations. The language, however, is not felicitous in defining this aspect of coverage. The duties which it apparently imposed on Medivox are to "make appropriate arrangements with radio stations" and to "deliver" the programs "on an exclusive broadcast basis with only one radio station in each of the designated marketing areas". The "appropriate arrangements" to which reference is made are "whenever possible, one broadcast per day, 5 days per week, 52 weeks per year for a total of 260 programs per year"; if such a broadcast schedule is "not possible to arrange *56 with a particular radio station, some other broadcast schedule may be followed." The duty to "deliver such series of programs" entails furnishing these to only one radio station in a single marketing area on an exclusive basis. Any inference otherwise generated by this language that it raises a positive duty to secure a radio station in every one of the designated marketing areas is effectively negated by the concluding sentence of the first paragraph of section 4.
To the extent that there is any latent ambiguity in the contract, there may be examination of relevant circumstances as well as the objects and purposes of the parties in order to fix more precisely the meaning of what was expressed in the written contract. Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293 (1953); Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485 (App. Div. 1963), certif. den. 40 N.J. 226 (1963). Extrinsic evidence to this end was offered freely by both parties; however, it does not support the conclusion pressed by Roche that the intention of paragraph 4 was to obligate Medivox to place the programs in all of the 200 designated markets or that Medivox was to secure any particular number of markets.
The negotiations which eventuated in the written contract were incepted at a meeting on May 13, 1964 at which there were present the three principals of Medivox and various representatives of Roche, including Dr. Virginius Mattia, at present the president of Roche but then the vice-president for marketing for all of the commercial divisions of Roche; William Enes, then general manager in charge of sales, marketing, advertising and promotion of Roche Laboratories, and Alfred Zobel, then director of public relations of Roche and its various divisions. Considerable time was spent discussing Medivox's proposal with respect to coverage and syndication. This would entail the solicitation by Medivox of the ranking radio stations in each of the top 200 retail drug sales marketing areas. Medivox mentioned that a considerable number of stations had been broached and that numerous "commitments of interest" had been received. It was further explained *57 that the marketing areas were selected in order to assure Roche, as a manufacturer of pharmaceuticals, meaningful coverage in areas where the program with Roche's name would have a maximum impact and benefit. It was not represented to Roche, however, that Medivox would obtain a radio station in each of the marketing areas, that is, 200 radio stations.
Medivox also explained its guarantee of broadcast time and the method by which it would be computed. It offered to guarantee Roche broadcast time worth 1 1/2 times the basic contract price, to be computed by a formula and, according to Medivox, the guarantee of broadcast time as proposed was preferable to a numerical guarantee of radio stations selected indiscriminately without regard to the type of audience to be reached.
The final contract was drafted and executed on May 28, 1964. The particular provisions for coverage went through a painstaking evolution. In an inital draft prepared by Medivox, it merely stated in general terms that the programs would be broadcast by stations throughout the country with no reference to any number of stations or marketing areas. In a subsequent draft prepared by Roche it was provided that Medivox would obtain a station "[i]n each of these 200 marketing areas." This provision, however, was changed radically in the final draft. In the executed contract, as noted, this provision dispelled any obligation to secure a particular number of stations.
The final contract reflects the common understanding ultimately reached by the parties. While Roche did during the course of negotiations desire that a specified number of radio stations be obtained by Medivox to carry the program, it capitulated to Medivox's suggestion that there be no minimum numerical guarantee and that Medivox need not obtain a radio station in each of the 200 designated marketing areas.
Medivox's performance with respect to syndicating the programs cannot be considered deficient either in terms of *58 the contract itself or even as measured against Roche's expectations of a numerical and percentage guarantee of stations and markets. Medivox had contracted with approximately 133 stations by the end of November 1964. At least 120 of these stations were, in fact, carrying "Milestones of Medicine" on a daily basis for 13-week periods. It had thus subscribed more than 50% of the stations in the top 200 marketing areas. Most of these radio stations were ranked 1, 2, or 3 in their particular areas. In terms of percentage of coverage these stations represented 25.5% of the national total of retail drug sales, more than 1/3 of 73% of the markets. Actual broadcast time achieved was $86,899, figured very conservatively on the basis of only 101 stations. This actual broadcast time was between 1/3 and 1/2 of the total broadcast time of $210.000 which Medivox had guaranteed. By the end of November 1964 the contract term itself was between 1/3 and 1/2 over, with still seven months to run. In view of all these circumstances, and against any measure of performance, it cannot be concluded that Medivox was guilty of a material breach of contract with respect to its efforts to syndicate the program.

II
Roche asserts that Medivox was in breach of its contract because of the poor quality of scripts. The validity of Roche's repudiation should be approached in terms of whether it had reserved expressly or impliedly a contractual power to be the final arbiter as to the quality of scripts. If Roche had reserved the ultimate right to be satisfied with scripts, the validity of its termination can be determined by the genuineness  not the reasonableness  of its dissatisfaction.
It is clear that there was no express contractual right to terminate the agreement, nor can such a right be implied. If, however, during the course of performance one party fails to perform "essential obligations under the contract," he may be considered to have committed a material breach and the *59 other party may elect to terminate. See, Frank Stamato & Co. v. Lodi, 4 N.J. 14, 21 (1950). Where a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which tend to "defeat the purpose of the contract." Winfield, etc., Corp. v. Middlesex, etc., Corp., 39 N.J. Super. 92, 102 (App. Div. 1956). In applying the test of materiality to such contracts a court should evaluate "the ratio quantitatively which the breach bears to the contract as a whole, and secondly the degree of probability or improbability that such a breach will be repeated." Maple Flock Co. v. Universal Furniture Products (1934) 1 KB 148, 157. See also, Restatement, Contracts, § 275, pp. 402-403 (1932).
In judging whether there was a material breach stemming from Roche's dissatisfaction with the quality of scripts, it is necessary initially to ascertain the standard of performance required by the contract. The critical contract language is contained in the following provision:
Roche reserves the right to review and approve all programs prior to their release and delivery to stations for broadcasting. Roche agrees to promptly notify Medivox of their approval or disapproval in each instance. If notice of approval or disapproval has not been received by Medivox within 10 days from the delivery to Roche of the program for review, then it shall be deemed approved by Roche; provided, however, that during the first thirty (30) days of this agreement such notice of approval or disapproval shall be given to Medivox within five (5) days.
This provision does not in explicit terms provide that scripts were required to meet Roche's satisfaction. Whether such an interpretation can fairly be imported depends in large measure upon an analysis of the written language itself in the context of all relevant surrounding circumstances. Atlantic Northern Airlines, Inc. v. Schwimmer, supra.
The right to review and approve necessarily includes the right to disapprove scripts. The contract does not purport to limit or curtail the exercise of this right. If such a qualification were within the contemplation of the parties it might *60 be expected that it would have been expressly set forth in light of the fact that a limitation of reasonableness was expressly included elsewhere in the contract with respect to Roche's approval of a substitute narrator. The right of approval with respect to scripts was not hedged with a similar condition as to reasonableness. Against the backdrop of the parties' own understanding, as evinced by their conduct during the course of performance as well as relevant custom and practice, this omission appears to be advertent and consistent with an intention not to qualify the approval of scripts by a reasonableness standard.
The conduct and discussions of the parties during the contract disclosed a mutual understanding that Roche had the right to reject scripts for any reason in the absence of bad faith. Scott testified that Roche had a duty to "cooperate" with Medivox based upon the credit line appearing at the end of each broadcast, viz:
"Milestones of Medicine" is prepared in cooperation with the research facilities of Roche Laboratories, Division of Hoffmann-LaRoche, manufacturers of fine pharmaceuticals.
This credit line, however, does not establish an affirmative contractual duty to "cooperate." In Mr. Scott's words, Roche's duty to cooperate required it to review scripts "conscientiously, sincerely, expeditiously and make determinations, even subjective, as to the satisfactoriness of scripts." Roche did in fact cooperate fully with Medivox. It cannot be concluded that any putative duty on the part of Roche to cooperate tempered its right to be satisfied absolutely with the quality of scripts.
Roche's pattern in evaluating scripts was not narrowed to any limited area. Roche acted upon the presumed right to review scripts and to reject them for any reason; and Medivox reacted in kind, acceding to this understanding, albeit disagreeing often heatedly with Roche's particular judgments on individual scripts. The actual conduct and practical understanding *61 of the parties exhibited in the performance of a contract may color its interpretation. Michaels v. Brookchester, 26 N.J. 379 (1958); Journeyman Barbers, etc., Local 687 v. Pollino, 22 N.J. 389 (1956). Here, the consistent actions of the parties sustains the view that Roche's right to review and approve scripts in the contract was final and not intended to be qualified by a reasonableness standard.
Further light is shed upon the meaning to be accorded the extent of Roche's right of review by the evidence proffered on relevant custom and usage. Performance to the sole and final satisfaction of another is not readily implied in the absence of plain language. Cf. Delhi Pipeline Corporation v. Lewis, Inc., 408 S.W.2d 295 (Tex. Ct. Civ. App. 1966) (court refused to imply such standard in a building contract in absence of express terms). In appropriate situations, however, attending circumstances, including practices and custom, may serve to clarify the common intention of parties. Ace Stone, Inc. v. Wayne Township, 47 N.J. 431 (1966)). Custom may strongly indicate that performance is to be to the satisfaction of another especially with regard to a contract involving matters of taste, judgment or preference. Cf. Haven v. Russell, 34 N.Y.S. 292 (Sup. Ct. 1895).
Edythe Scott testified that in the advertising field it is recognized that the client has an absolute right to reject copy of advertising materials. In her words, "The client is boss." Greene stated that in advertising generally a client has the right of approval or disapproval; if a client doesn't like advertising matter, he has the right to send it back, subject to good faith, and this is also the practice in the general field of public relations. Messrs. Zobel and Lerner, who were directly responsible for Roche's public relations and advertising, stated that Roche was "the client" and if it did not like or want a script, it had the right to reject it.
Thomas O'Brien, who was offered as an expert on behalf of Medivox, expressed the view that, even in the absence of an express provision, a right of review and approval as to each program would be evident from the very inclusion of a credit *62 or tag line at the end of each program. He did state that Roche's right to review scripts had to be exercised reasonably, but indicated that this meant Roche could not resort to "nit-picking." This view was not inconsistent with the standard of review otherwise expressed that Roche in rejecting scripts was limited only to the extent that it could not be arbitrary or act in bad faith.
None of the witnesses testified categorically that the custom or practice by which a client has the absolute right to reject advertising materials was specifically applicable to "Milestones of Medicine." Such a practice or custom, nevertheless, does have a tangential bearing upon the interpretation of this contract. While "Milestones of Medicine" was not an advertising or marketing program in the sense of being geared to the sale of products, it was a promotional or public relations project. Promotion is closely related to the allied fields of advertising and marketing, and this relationship was recognized by the parties. For example, there were discussions of "cross-merchandising" the radio programs. This dimension of the program was also underscored by the fact that the persons in charge for Roche were involved in promotion, sales, marketing and advertising.
In sum, the contract itself accords Roche the right to review and approve scripts; it does not limit this right to approve scripts by any standard of reasonableness or other objective criteria. The practical understanding of the parties was that the contract reposed final judgment with respect to quality and worth of scripts in Roche. Furthermore, the program was a promotional one with commercial overtones and closely related to advertising and marketing where clients or sponsors, by virtue of custom, trade and usage, enjoy the unqualified right to be satisfied. It is to be concluded, therefore, that Roche did have the right to reject scripts for any reason whatsoever, absent bad faith. In essence, the contract between the parties was a satisfaction contract whereby Medivox obligated itself to produce scripts which would be satisfactory to Roche.
*63 In Haven v. Russell, supra, at 293, the court articulated the applicable principles regarding the performance of a satisfaction contract:
* * * Where a contract is made to gratify the taste, serve personal convenience, or satisfy individual preferences, to the satisfaction of the other parties to the agreement, the question of satisfaction is left entirely to the parties to be satisfied. * * *
This principle of contract law has been broadly recognized, viz:
Where the contract in which one party agrees to perform to the satisfaction of the other involves matters of fancy, taste, sensibility or judgment of the other party, such matters must reasonably be considered elements of predominant importance in the performance. In such contracts the party agreeing to perform to the satisfaction of the other party renders the other the sole judge of his satisfaction, and this ordinarily without regard to the justice or reasonableness of his decision, and a court or jury cannot say that such party should have been satisfied where he asserts that he is not. Where the approval involves an affair of individual judgment on which there can be no standard of reasonableness, there must be personal satisfaction. * * * 17A C.J.S. Contracts § 495, pp. 719-720 (1963).
The New Jersey understanding is in accord. See, e.g., Hayes v. Kluge, 86 N.J.L. 657 (E. & A. 1914). The controlling factor is not whether the promisee in a satisfaction contract ought to have been satisfied but whether, in fact, it was. Corn Products Refining Co. v. Fasola, 94 N.J.L. 181 (E. & A. 1920).
These legal principles guide the inquiry into the issue of the nature and extent of Roche's dissatisfaction as well as the question of whether Medivox's failure to satisfy Roche as to the quality of scripts, after it had produced 135 out of 260 programs and with seven months to go under the contract, constituted a material breach.
The extent of Roche's dissatisfaction is not to be measured solely by the number of scripts rejected. Many scripts with which it was dissatisfied were approved by it reluctantly. Roche was obviously displeased with a substantial *64 number of scripts. Roche's dissatisfaction involved various aspects relating to the quality of the scripts but it focused especially upon factual accuracy and content. Section 2 of the contract in pertinent part provides:
Medivox will assure the factual accuracy of the program content and obtain appropriate releases when necessary. Medivox will hold Roche harmless against any and all liability, claims, damages, costs, and expenses, including counsel fees, which result or may result from any action in connection with the creation, distribution and broadcasting of the programs; however this provision shall not apply to any liability, claim, damage, cost or expense arising directly from any change in or addition to a program script made by Roche.
Roche asserts simply that this contractual provision obligated Medivox to produce scripts which were free of factual inaccuracy. Medivox does not disclaim this contractual responsibility but urges that the duty to assure factual accuracy was a joint one. It points again to the "credit line." The credit line, however, in no way establishes a duty on the part of Roche to either provide factual accuracy or to detect inaccuracy; it was solely Medivox's responsibility to assure factual accuracy.
Roche, prior to the final execution of the contract on May 28, 1964, advised Medivox that its standards for factual accuracy were extremely high. It explained that as a manufacturer of pharmaceuticals not even the slightest degree of factual inaccuracy could be afforded, and that this was especially true in connection with a nationwide program dealing with medicine. Medivox knew that Roche was "checking every fact" and it recognized its own obligations with respect to the factual aspects of the program, including medical accuracy when it undertook to buttress its performance for accuracy by hiring two medical doctors and a researcher in early October 1964 for this very purpose. Moreover, there was expert opinion that the highest standards of accuracy would be necessary in a program relating to human health and life, and that a sponsor in the pharmaceutical industry could be expected to be much more zealous with *65 respect to factual accuracy than would a sponsor in other fields not related to health where the risks of inaccuracies would not be of the same magnitude.
Medivox prior to the termination of its contract, had achieved an imperfect record with respect to factual accuracy. It was established that there were at least 15 errors which occurred in various scripts. An additional ten errors were disputed. If no qualitative distinction were drawn with respect to the type of errors, it could not be said that this total number of errors was de minimis. Medivox generally depreciates their gravity on the grounds that several were corrected before broadcast, some were not "broadcast errors", i.e. not noticeable on listening to a radio broadcast, and others were miniscule or of only limited significance in the context of the programs. Some errors which involved medical and technical subjects might from a layman's point of view be considered abstruse or picayune. Nevertheless, by professional standards, these errors would not be mere foibles. None of these errors, however, can be shrugged off. In the context of the program's objectives of fostering a favorable impression of persons and institutions involved in the health field as well as the importance of drugs, and of affecting in the mind of the public an image of Roche as a responsible manufacturer of pharmaceuticals, factual inaccuracies regardless of degree would pose a serious threat to the program's success. Under these circumstances, Roche's dissatisfaction was patent and genuine.
Roche also stresses that its dissatisfaction with scripts extended to their content and quality as well as their tone and dramatic effects. The contract states only that Medivox was responsible for producing "a series of dramatic narratives based on true incidents in medical history * * * under the title `Milestones of Medicine'." Roche contends that too many scripts were not "milestones" in that they involved either remote or insignificant events in medical history or failed to convey an appropriate impression in terms of the programs' desiderata.
*66 The content of scripts early became a bone of controversy between the parties. Medivox took the position that each individual script was not required or expected to be medically significant and that individual scripts which might be shy on medical significance but strong on drama and human interest could be interspersed throughout the series and thereby serve the promotional goals of the entire project. Medivox emphasizes that at the initial presentation meeting on May 13 Roche heard three such programs and that the broadcasts which were eventually produced were comparable to these demonstration programs. These three programs, however, could not foreshadow completely the content, style and tone of 260 programs yet to be produced. Nor were they considered or accepted by Roche as the sole measure of the programs that would be developed. Roche was genuinely distressed with the content and what it considered a childish or sophomoric style of many of the scripts, and even felt that some disserved the cause of health. Its dissatisfaction with the quality of scripts was not arbitrary or in bad faith.
Roche further contends that Medivox failed to comply with its undertaking "to originate, create, prepare and produce" the "Milestones of Medicine" series. It was expected that Medivox would hire script writers who would extract from sources certain factual matters, such as medical events and technical procedures. Other aspects of the written scripts, including style, dramatic effects and the like, were expected to bear the stamp of the writer's own skill. It was understood that these matters could not be "lifted" from the writing of others.
Four scripts embraced too much material transposed directly from others. Other scripts in varying degrees had some words or phraseology apparently extracted verbatim from their sources. Roche, however, at no time became dissatisfied with scripts during the course of the contract because of "lifts" or their lack of originality. Its criticism of this aspect of Medivox's performance was mounted after it *67 had terminated the contract and the dispute between the parties moved into the arena of litigation. Considering the totality of the 175 scripts which eventually were produced, it cannot be concluded that Medivox had failed to meet its duty to produce original scripts or that Roche's retrospective dissatisfaction on this score was genuine.
Medivox stresses that Roche's remedy for unsatisfactory scripts consists in the rejection of scripts rather than termination. It finds itself, however, arguing in elliptical fashion that since Roche had the right to reject scripts it could as a practical matter "strangle the flow of programs and eventually make the completion by Medivox impossible * * * but [it could do so] only by rejection of scripts and not by termination of the contract."
Dissatisfaction which occurs during the course of a contract calling for satisfactory performance over an extended period of time may justify termination by the promisee. Fursmidt v. Hotel Abbey Holding Corp., 10 A.D.2d 447, 200 N.Y.S.2d 256 (App. Div. 1960); Schmand v. Jandorf, 175 Mich. 88, 140 N.W. 996 (Sup. Ct. 1913). In Ferris v. Polansky, 191 Md. 79, 85, 86, 59 A.2d 749, 752 (Ct. App. 1948), the court stated:
"In a contract where the employer agrees to employ another as long as the services are satisfactory, the employer has the right to terminate the contract and discharge the employee, whenever he, the employer, acting in good faith is actually dissatisfied with the employee's work. This applies, even though the parties to the employment contract have stipulated that the contract shall be operative during a definite term, if it provides that the services are to be performed to the satisfaction of the employer."
In the instant case the contract required the production by Medivox of 260 separate scripts satisfactory to Roche over a period of one year. In this context it is appropriate to apply ordinary principles of material breach to determine whether Medivox's failure to satisfy Roche with respect to numerous individual scripts after five months reached to the essence of the contract. Frank Stamato & Co. v. Lodi, and Winfield, etc., *68 Corp. v. Middlesex, etc., Corp., supra. It is therefore proper to consider the extent to which scripts were unsatisfactory as well as the likelihood that Medivox's performance of the remainder of the contract would have conformed with Roche's expectations. Maple Flock Co. v. Universal Furniture Products, supra.
It cannot be said that Roche did not afford Medivox ample opportunity to produce scripts to its satisfaction in fulfillment of its obligation. Termination occurred five months after the inception of the contract. Medivox had prepared and submitted approximately 135 scripts  more than half the total required under the contract. By that time there was small likelihood that in the performance of the remainder of the contract Medivox would be able to furnish scripts whose quality would eventually please Roche or abate its existing dissatisfaction.
Roche's dissatisfaction with scripts was not a belated reconstruction made after its decision to terminate; rather, dissatisfaction existed almost from the inception of the contract and was expressed constantly by letter, by memoranda, by telephone and at several personal meetings. Such dissatisfaction with the quality of scripts was in good faith and touched upon a substantial number of scripts. Roche, in sum, was genuinely dissatisfied with Medivox's performance with respect to the quality and content of scripts and its dissatisfaction was "real and not pretended, capricious, mercenary, or the result of dishonest design." Ferris v. Polansky, supra, 59 A.2d at 752. Medivox' dereliction in failing to produce scripts satisfactory to Roche over a five-month period of time did defeat the essential purpose of the contract. Medivox, therefore, had committed a material breach of contract and Roche was entitled to terminate the agreement.

III
Roche charges Medivox with fraudulent misrepresentation and concealment during the negotiation as well *69 as the performance of the contract and asserts that on the basis of such fraud it was entitled to repudiate the contract and to recover damages on the basis of rescission and restitution. Medivox strenuously denies the charges of fraud.
Ordinarily, in actions at law fraud must be established by a preponderance of the evidence. Newark Live Poultry Co. v. Fauer, 118 N.J.L. 556 (Sup. Ct. 1937). In equity actions sterner proofs have been required. In such actions proofs must be "clear and convincing"; they must "domonstrate a high probability * * * or a strong probability, or that it is much more probable than not, that there was fraud." Post v. Gerson Bacher, Torrid K-9, Inc., 48 N.J. Super. 518, 521 (App. Div. 1958). As a practical matter, in a case where the same acts of fraud are urged as a basis for both a legal defense and equitable relief, the evaluation of proofs and the determination of facts should proceed initially upon the conventional standard of proof based upon a preponderance of the evidence; if under this measure fraud is not established, a further inquiry based upon a stricter standard of proof would be obviated.
Roche charges that Medivox fraudulently concealed that John Scott, the narrator of "Milestones of Medicine," was restricted from broadcasting on any radio station other than WOR within a 50-mile radius of New York City, and that the policy of WOR prevented that station from broadcasting a program such as "Milestones of Medicine." These facts, Roche asserts, were crucial in that they rendered it impossible to obtain a radio station to carry "Milestones of Medicine" in the New York marketing area which was the number one area for the retail sale of drugs in the United States.
A half-truth may be as misleading as a statement which is wholly false. A fraudulent misrepresentation may inhere in a statement which is truthful so far as it goes but which is materially misleading because of the failure to recite qualifying matters. See Nationwide Motorist Ass'n of Michigan, Inc. v. Nationwide Motorist Ass'n., 273 F. Supp. 875 (W.D. Mich. 1967); 37 Am Jur.2d Fraud and Deceit, § 151 *70 (1968). The intentional concealment of material information is tantamount to an affirmative misrepresentation of the non-existence of such information.
There is no question that the marketing area encompassing New York City was important in terms of national retail drug sales; New York was the number one market constituting approximately 7.5% of the national total. The affirmative disclosure that the New York market was not available or the disclosure of other information from which it could be inferred that New York could not be obtained, might have had an impact on Roche's decision to enter the contract. There was, however, neither an intentional nor inadvertent concealment on the part of Medivox of relevant circumstances concerning the availability of New York as a broadcast area.
Medivox, as it approached its initial meeting with Roche, was apprehensive about the question of securing a radio station in New York. Greene admitted to a feeling of "fear" that the topic would arise and that a New York station might be considered a sine qua non by Roche. His attitude was that Medivox would "finesse" the question, meaning that it would only be discussed if Roche mentioned it. This attitude bespeaks of a lack of candor and business honesty on the part of Medivox. If Roche itself had not raised the question of New York at the meeting and Medivox had opted to say nothing, this charge of fraudulent concealment might have had telling consequences. The subject of New York, however, was broached by Dr. Mattia who inquired about New York. In answer it was disclosed to Roche that Scott was "married to WOR" and if a station in New York were to be obtained, it would have to be WOR. On these facts, Medivox was not guilty of fraudulent concealment with respect to New York as an available marketing area. Roche was further sufficiently alerted that there might be difficulties in securing WOR. It was not stated in so many words that "Milestones of Medicine" was contrary to WOR's policy or that WOR would not carry the program. But Roche has not established *71 that such was the policy of WOR or that WOR could not have been persuaded to broadcast the program.
Roche further charges that Medivox misrepresented that it had obtained the leading station in Washington, D.C. to carry the program. The reputation of the drug industry apparently had been tarnished only a few years before as a result of the "Kefauver hearings." Since the program was designed to improve the standing of the drug industry, Roche felt that a station in the nation's capital was important. It was not, however, fraudulently represented to Roche that Medivox had obtained any radio station in Washington. At the initial meeting mention was made of various radio stations throughout the country which had expressed interest in the program, including the leading station in Washington, D.C. In the letter of May 13 sent to Roche after the meeting there was enclosed an accompanying sheet which purported to be a list of radio stations. This list indicated only that these stations had signed a so-called "commitment of interest," as opposed to a binding contract. Roche was, therefore, neither entitled to assume that a radio station in Washington, D.C. had been secured by Medivox, nor that Medivox would do more than use its best efforts to obtain such a station. To the extent that Medivox was then confident of obtaining a station in Washington and conveyed such feelings of assurance to Roche, this was not of itself false and did not constitute a deceit on its part.
A charge was also made that Medivox was guilty of fraud with respect to its reports concerning broadcast time during the course of performance. It is not disputed that there was a variance between the broadcast time as reported by Medivox to Roche and the actual broadcast time which was established in fact. This disparity between the reports and the fact is not of critical importance. Medivox did not intentionally or willfully make false reports. Medivox's reports were made in accordance with the formula mutually agreed upon by the parties in the contract, to wit:
*72 A station will be considered to be broadcasting `Milestones of Medicine' if and from the date indicated in the copy received by Roche of the signed agreement between Medivox and such station. However, if circumstances indicate the program has not been broadcast, then Medivox will, at Roche's request, forward to Roche reasonable evidence to determining whether the program was in fact broadcast. If such evidence fails to show the program was in fact broadcast, appropriate adjustment will be made in the guaranteed broadcast time.
Medivox's reports reflected broadcast times calculated in accordance with this provision, that is, from the dates set forth in the contracts signed by the individual radio stations. To the extent that actual broadcast time at the end of the contract was less than the time reported by Medivox, Roche's relief was a reduction in the basic contract price, if total air-time did not meet the contract guarantee. There was no fraud with respect to this aspect of Medivox's performance.
Another allegation of fraud concerned the listing of sources in various scripts which had not in fact been used. Roche required that scripts specify sources, and it was entitled to expect that the subject matter of the scripts was derived from the listed sources. In the case of several scripts Roche ascertained after its termination of the contract that certain facts and topics were not even treated in a particular source listed with the script. The instances in which this occurred, however, were relatively sporadic and insubstantial in terms of the total number of scripts produced. Fraud must pertain to a material aspect of the contract. Lembeck v. Gerken, 86 N.J.L. 111 (Sup. Ct. 1914). This dereliction on the part of Medivox cannot be considered material and does not constitute the practice of an actionable fraud.
In the eighth count of the counterclaim, Roche alleges
In or about May, 1964 plaintiff through its agents, servants, and employees falsely and fraudulently represented to defendant that its concept for the distribution, marketing and solicitation of stations for the broadcasting of said radio program series was new, novel, and unique. In fact, plaintiff's concept was neither new, novel, nor unique but had been in use in syndicated radio broadcasting for many years past. (Emphasis added) *73 Medivox objected to the introduction of evidence relating to a radio program called "Medical Milestones" produced by the American Medical Association (AMA) as substantive proof of fraud under this count, although such evidence was permitted for purposes of affecting credibility. The basis for its objection, the ruling upon which was reserved at the trial, was that this particular charge of fraud had not been divulged either in the pleadings, answers to interrogatories or the pretrial order.
Interrogatories propounded of Roche requested it to "state the detail of the concept" to which reference was made in the counterclaim. Roche's answer in no way disclosed that the concealment of the existence of the AMA program was the basis of its allegation of fraud. The pretrial order which encompassed Roche's factual and legal contentions itemized six fraudulent acts charged to Medivox. The only one having any possible or apparent relevance stated [t]hat "Medivox fraudulently induced HLR to enter the contract by falsely representing that the concept for distribution, marketing, and solicitation of stations to broadcast the program was new, novel and unique". (Emphasis added). This obviously relates to the eighth count of the counterclaim. Additionally, in an extensive trial brief submitted by Roche in accordance with the pretrial order, each of the issues of fraud as alleged in the counterclaim was developed and discussed in detail. Thus, Roche with respect to every other charge of fraud lodged against Medivox left plaintiff under no misapprehension as to the specific acts constituting the fraud. But nowhere in this panoply of pretrial allegations, contentions and recitals is there the slightest reference to a fraudulent act consisting of the concealment from Roche of the existence of a radio program similar to "Milestones of Medicine."
Medivox was entitled to assume that the eighth count of the counterclaim recited all of the essential details constituting the fraudulent act charged against it. R.R. 4:9-1. The evidence proffered by Roche concerning the existence of the AMA program and its concealment from Roche fell beyond *74 the allegations of fraud in the counterclaim, as well as the issues as framed in the pretrial order. Evidence offered which is without the scope of the contentions and issues as framed in the pretrial order should be excluded. Schlossberg v. Jersey City Sewerage Authority, 15 N.J. 360 (1954); Lertch v. McLean, 18 N.J. 68 (1955). To the extent that a particular contention is neither asserted in the pleadings nor set forth in the pretrial order, or disclosed by interrogatories submitted and answered, the party relying thereon should be foreclosed at trial from establishing such claim. Jardine Estates v. Koppel, 24 N.J. 536 (1957).
Roche seeks escape from this result by pointing out that Medivox was privy to sufficient information or knowledge concerning the AMA program and could not fairly claim to have been surprised. The existence of the AMA program of "Medical Milestones," as it developed, was a significant circumstance. Greene testified that he had no present knowledge of the AMA program although he had been informed of such a program in connection with Medivox's earlier solicitations. Nevertheless, he stated candidly that Roche would have wanted to know of "Medical Milestones" before it entered into a contract with Medivox. The AMA program was substantially similar to the Medivox program in content, style and format, but there were also important differences in purpose, scope and distribution. Roche obviously was advantaged in not disclosing this contention of evidence in advance of trial. Had Medivox been apprised of Roche's contentions that the failure to disclose the existence of the AMA program constituted a fraudulent concealment of a material fact, Medivox would have been in a position to develop and present evidence relevant to this issue.
Taking into account all of these considerations  the pleadings, the factual contentions in the pretrial order, all of the answers to interrogatories, the trial brief, as well as Medivox's own knowledge  the conclusion is inescapable that Roche intended to steal a tactical march at the trial with this evidence  and it succeeded. The success of Roche's ploy, *75 however, is its undoing. Roche sought to navigate the treacherous course between a Scylla and Charybdis, between its duty to apprise and desire to surprise its adversary. In view of the timely objection raised by Medivox to limit the inclusion of such evidence solely to the issue of credibility, and the manifest unfairness in permitting this evidence to be considered on the substantive issue of fraud, the objection must be sustained and the evidence disregarded as tending to establish this charge of fraud.
The eighth count of the counterclaim relates to the method of syndicating "Milestones of Medicine." Greene testified that in connection with a prior undertaking he had participated in the syndication of radio programs through the use of contracts with radio stations. The experience apparently involved FM stations and did not approach the syndication of "Milestones of Medicine" in terms of promotional objectives, scope or selection of markets or stations. This did not render fraudulent the representation that the "concept for the distribution, marketing and solicitation of stations * * * was new, novel, and unique."

IV
In view of the determination that Roche's termination of the contract was justified, it was not in breach of contract. Medivox consequently is not entitled to recover the balance due upon the contract.
Roche itself seeks an affirmative recovery based upon rescission and restitution of its payments under the contract, as well as for consequential damages attributable to Medivox's breach.
A material breach going to the essence of the contract may under appropriate circumstances justify the remedy of rescission. Smith v. First Provident Corp., 245 S.C. 509, 141 S.E.2d 646 (Sup. Ct. 1965); Gaertner v. Rees, 259 Minn. 299, 107 N.W.2d 365 (Sup. Ct. 1961). This remedy, however, is generally only available when the *76 party seeking to rescind can restore the other party to the status quo. 17 Am. Jur.2d, Contracts, § 512 at 994 (1964). After part performance a party is not entitled to rescind without returning or tendering the consideration or benefits received. MacFadden v. MacFadden, 49 N.J. Super. 356, (App. Div. 1958); Panco v. Rogers, 19 N.J. Super. 12 (Ch. Div. 1952).
This rule is not rigid but is founded in equity and justice. Medivox, of course, cannot be placed in statu quo ante. It is apparent that during the course of the contract Roche, despite its dissatisfaction with numerous scripts, elected to receive some 135 programs which were broadcast, and it derived whatever benefits inhered in these programs. While it has been established that the quality of scripts failed to satisfy Roche, that this constituted a material breach and that Roche was not obligated to continue the contract, it has not been demonstrated that Medivox's performance and the programs which it produced were so bereft of value to Roche that equity compels a restitution. Moreover, to the extent that Roche's claim for rescission and restitution is founded upon fraud, this claim necessarily fails with the failure of proof on this issue. Finally, Roche has not established that it suffered any special loss or tangible injury as a result of Medivox' breach of contract, which would otherwise entitle it to consequential damages.