842 So.2d 133 (2003)
Harry LEOPOLD, Appellant,
v.
KIMBALL HILL HOMES FLORIDA, INC., a Florida corporation, Appellee.
No. 2D01-4072.
District Court of Appeal of Florida, Second District.
February 5, 2003.
Rehearing Denied April 15, 2003.
*134 Kimberly A. Bald and Brian L. Trimyer of Harllee & Bald, P.A., Bradenton, and Douglas R. Bald of Fergeson, Skipper, Shaw, Keyser, Baron & Tirabassi, Sarasota, for Appellant.
Michael L. Rosen and Gregory J. Orcutt of Bricklemyer Smolker & Bolves, P.A., Tampa, for Appellee.
COVINGTON, Judge.
The issue presented is whether the agreement entered into by the parties is a valid, enforceable contract or whether it is simply an agreement to agree in the future. Finding that essential terms remained open for further consideration, the trial court concluded that the agreement was not an enforceable contract. We disagree and thus reverse the final judgment.
Harry Leopold and his wife, Victoria, decided to build a home in the Lakewood Ranch community of Manatee County, Florida. The Leopolds became interested in Lot 33 of the Edgewater Sound subdivision. In May 1999, the Leopolds met with Nancy Rowe, a sales consultant for Kimball Hill Homes Florida, Inc. Kimball Hill, a builder of single-family homes in Edgewater Sound, was the exclusive builder for the lot selected by the Leopolds. At that time, Kimball Hill offered four models with variations available for construction in the subdivision.
The Leopolds discussed with Ms. Rowe their desire to build a home according to their own custom plan. Ms. Rowe informed the Leopolds that Kimball Hill was not a custom builder, and she was unsure whether Kimball Hill would allow them to build a home according to their own design.
Nevertheless, Mrs. Leopold drew an initial sketch of the type of home she wanted. After reviewing the drawing, the concept for the home was approved by Kimball Hill, subject to certain requirements. First, the Leopolds would be required to employ and pay for Kimball Hill's architect; second, the home design could not exceed 3100 square feet; and third, Kimball Hill would have the right to use the Leopolds' home design in the future. The Leopolds were informed that any design had to be approved by the Lakewood Ranch Planning Review Committee before construction would be allowed.
A document entitled Homebuyers Agreement was signed by the parties on May 27, 1999. The Homebuyers Agreement consisted of a preprinted form prepared by Kimball Hill. The form contained a blank line for inclusion of the builder's plan to be used. Ms. Rowe inserted the term Stratmon V so that the Kimball Hill computer would recognize the agreement and Lot 33 could be identified as sold. At the time the agreement was signed, a model plan for the Stratmon V did not exist. The term Stratmon was selected because it was the largest and most expensive home built by Kimball Hill in Edgewater Sound. The term V was included to distinguish between a model Stratmon home and the Leopolds' custom home. In addition, V stood for Victoria, Mrs. Leopold's first name.
At Mr. Leopold's request, several changes were made to the preprinted form. The financing contingency contained in paragraph two, entitled Mortgage Loan, was revised by insertion of the underlined portion:
This agreement is contingent upon Homebuyer's obtaining a mortgage loan on the above referenced property.

*135 Homebuyer shall make application within five (5) business days of the date of this Agreement of agreed upon plans by Homebuilder [and] Homebuyer and shall diligently attempt to obtain approval of said loan.[[1]]
In addition, paragraph five, entitled Completion of Construction, was amended to reflect that plans and specifications could be modified by either the builder or the buyer. Finally, the right of the builder to install selections of his choice upon the buyer's failure to make such selections within twenty-one days of the signing of the agreement was deleted.
The parties agreed to a price of $390,000, that is, $115,000 for the lot and $275,000 for the home. Pursuant to the terms of the agreement, the Leopolds deposited a total of $20,000 with Kimball Hill for the home. The Option Addendum, also signed on May 27, 1999, provided that options were "To Follow." The parties understood that any additional options would increase the price of the home.
Thereafter, Jon Morris, vice-president of Kimball Hill, contacted Heather Attardo of the architectural firm used by Kimball Hill. Mr. Morris informed Ms. Attardo that he had some customers who wanted to use their own design. Ms. Attardo was not able to begin work on the Leopolds' residence until September 1, 1999, due to other previously scheduled commitments. Nevertheless, the Leopolds entered into a contract with Ms. Attardo's firm and forwarded a $2000 retainer. Under the terms of the agreement, the Leopolds were to pay a total of $8000 for architectural services rendered in connection with the design of their home.
The plans were revised several times, and on December 6, 1999, Mrs. Leopold executed a phase completion form representing the Leopolds' approval of the home design. The plans were submitted to Mr. Morris and Ms. Rowe on December 7, 1999. Upon his review of the plans, Mr. Morris felt that there was a problem with the design and requested a meeting with the Leopolds. Mr. Leopold was informed that Kimball Hill would not construct the home because it was believed that the plans would not be approved by the Planning Review Committee. However, Kimball Hill had not submitted the plans to the Lakewood Ranch Planning Review Committee for its approval. It is noted that at no time did Kimball Hill submit the plans to the Planning Review Committee.
In January 2000, Mr. Morris personally met with the Leopolds, and the Leopolds were told that their deposits would be refunded and their architectural expenses reimbursed. At that meeting Mr. Morris told the Leopolds that he did not agree with their plan and that Kimball Hill could not build their home.
The Leopolds inquired as to whether Kimball Hill would build a Lyndale Plus model on Lot 33. The terms proposed by Kimball Hill included an agreement that the Leopolds sign a new contract and that Kimball Hill could raise the quoted construction price of $542,500, which did not include the lot. The Leopolds rejected that offer as unreasonable. Mr. Leopold also discussed the possibility of building a Stratmon I model on Lot 33. Mr. Morris indicated that Kimball Hill was willing to sell Lot 33 for $115,000 but that Kimball Hill would only build the home if Mr. Leopold agreed to an increase of over $30,000 from the original contract price. The Leopolds also rejected that offer.[2]
*136 Kimball Hill filed a complaint for declaratory relief against Mr. Leopold, requesting that the court declare the parties' contract void ab initio for lack of an essential term or lack of meeting of the minds between the parties. Mr. Leopold, in response, filed a counterclaim. Initially, Mr. Leopold sought damages for breach of contract along with specific performance; subsequently, the counterclaim was amended to also allege fraud in the inducement as well as fraudulent misrepresentation.
After a nonjury trial, a final judgment was entered in Kimball Hill's favor based on the trial court's determination that the Homebuyers Agreement was not a valid contract. Consequently, the trial court decided that Mr. Leopold should not recover in his counterclaim for breach of contract nor should he be entitled to specific performance. Since the trial court found no evidence of fraud in the inducement or fraudulent misrepresentation, recovery based on those theories was also denied. The trial court did, however, conclude that Mr. Leopold was entitled to recover the deposit advanced when he executed the Homebuyers Agreement.
Mr. Leopold raises several issues on appeal. With respect to the $20,000 deposit, Mr. Leopold submits that the trial court was incorrect in not awarding him interest on those funds. Mr. Leopold also alleges that the trial court erred in not awarding him damages or specific performance and in failing to "pierce the corporate veil" between Kimball Hill and its parent company. We recognize that "when there is competent evidence to support the findings and the judgment of the trial court it is the duty of this court to affirm." Cont'l Dev. Corp. of Florida v. Duval Title & Abstract Co., 356 So.2d 925, 927 (Fla. 2d DCA 1978). Nevertheless, questions of law are reviewed under the de novo standard, Kaplan v. Bayer, 782 So.2d 417, 419 (Fla. 2d DCA 2001), and we "are not bound to give the trial judge's interpretation any weighted presumption of correctness." Florida Power Corp. v. Lynn, 594 So.2d 789, 791 (Fla. 2d DCA 1992) (citation omitted).
Mr. Leopold submits that the trial court erred by finding that there was no enforceable contract. Thus, we must determine whether "there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract." Mehler v. Huston, 57 So.2d 836, 837 (Fla. 1952). In deciding whether there has been a meeting of the minds, courts look not to "`the agreement of two minds in one intention, but on the agreement of two sets of external signsnot on the parties having meant the same thing but on their having said the same thing.'" Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404, 407 (Fla.1974) (citation omitted).
What did the Leopolds and Kimball Hill agree to? The relevant and salient findings of fact, as determined by the trial court, are that the parties agreed that Kimball Hill would build a home for the Leopolds on Lot 33 and that the plan to be used would be the Stratmon V. Although the Stratmon V was not in existence at the time that the contract was signed, the parties agreed that the design would be created. The parties also agreed as to the *137 price-$275,000 for the house and $115,000 for the lot, for a total of $390,000. The parties noted that any options to the house were to follow. In addition, the parties agreed that the size of the house would not exceed 3100 square feet, that the Leopolds would hire and pay for Kimball Hill's architect, and that Kimball Hill would have the right to use the Leopolds' home design in the future. Finally, the parties agreed that the Lakewood Ranch Planning Review Committee had to approve the design before construction could begin. These were the essential terms of the agreement, and they did not remain open for further consideration.
Kimball Hill submits that essential terms were left open because Mr. Leopold added language to the Homebuyers Agreement form. We disagree. Mr. Leopold added language to the financing contingency clause extending the time in which he could obtain financing. Mr. Leopold also added a term to the completion of construction portion of the contract. As it was originally written, only Kimball Hill could modify the plans. With the change in place, both the builder and the buyer had the right to make modifications to the plans as construction proceeded. Neither of these changes resulted in an indefinite and uncertain agreement.
The parties agreed that the plans would be created after the contract was signed and that the options to be added would follow. Testimony at trial revealed that in the building industry, at times, upgrades are priced during the construction of the home. Buyers make changes, and they add options to the homes that they are having built. It has been acknowledged that:
[c]onstruction contracts rarely, if ever, are performed exactly as they are written. In such a complex undertaking as building construction, there is frequently something left out of design drawings. A specified material may be unobtainable. The design professional or the owner may desire a change as they see the project develop.
Larry R. Leiby, Florida Construction Law Manual, § 7:15 (4th ed.2001).
The fact that the Stratmon V plans did not exist at the time that the contract was signed or that the options to be added were not listed does not mean that essential terms were omitted. Every potential contingency does not need to be addressed in order for there to be an enforceable contract. Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla.1985). As recognized in Blackhawk Heating & Plumbing Co., 302 So.2d at 408:
"Even though all details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them. A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto." 17 C.J.S. Contracts § 31.
The trial court, as well as Kimball Hill, relied on Cavallaro v. Stratford Homes, Inc., 784 So.2d 619 (Fla. 5th DCA 2001), to conclude that there was no meeting of the minds as to the completed price and the type of home to be constructed. However, that reliance is misplaced. In Cavallaro, the parties had executed a lot reservation agreement as to a particular piece of property, not a final contract for sale and purchase. Significantly, "the parties' agreement failed to contain the requisite essential terms such as the purchase price and design of the home, and the terms and conditions of construction." Cavallaro, 784 So.2d at 621.
*138 In contrast, the parties before us did in fact have a meeting of the minds as to the essential terms of the contract. Those terms consisted of a specifically identified lot costing $115,000 and a base sales price of $275,000 for a house. The trial court found that the parties agreed that the base sales price of the house was $275,000 because that was the base price of the Stratmon I model and that any options that were added would increase the sales price of the home. As also found by the trial court, the Leopolds eventually agreed to accept the original Stratmon I model on the originally selected lot. Nevertheless, Kimball Hill demanded an additional $30,000 from the original contract price apparently in an effort to participate in the rising market for Lot 33. However, such participation was precluded when the parties, as a matter of fact and intent, allocated the risk of market price fluctuations occurring subsequent to May 27, 1999, by entering into and fixing the contract price and essential construction specifics as of that date. That was the basis of their bargain.
Since the parties did have a meeting of the minds on the essential terms of the contract, the contract was a valid, enforceable contract under the facts presented. Mr. Leopold completed his end of the bargain, and thus Kimball Hill should be held accountable.
Because we find that there was an enforceable contract, the issue of damages sought by Mr. Leopold needs to be readdressed by the trial court. Accordingly, this matter is remanded to the trial court for a determination of the amount of damages that Mr. Leopold is owed pursuant to his counterclaim for breach of contract, as well as the amount of interest that he is due on his $20,000 deposit. In all other respects, including denial of specific performance, the findings of the trial court are affirmed.
Affirmed in part, reversed, and remanded.
WHATLEY, J., Concurs with opinion.
FULMER, J., Dissents with opinion.
WHATLEY, Judge, Concurring.
I concur with the majority opinion.
A contract must receive a reasonable construction. In Bay Management, Inc. v. Beau Monde, Inc., 366 So.2d 788, 791 (Fla. 2d DCA 1979), the court stated that "the court should arrive at an interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties."
Here, the parties agreed to all of the essential elements of a valid contract. The specific lot, the price, the down payment, the use of a specific architectural firm, the square footage, and the ultimate approval by the third party review committee were agreed to. The contract itself was on the preprinted form of Kimball Hill. Leopold complied by making the $20,000 down payment, paying the architectural firm (which was selected by Kimball Hill), and attempting to arrive at an acceptable house plan. Of note, Kimball Hill never objected to the receipt of the deposit or the payment to the architectural firm. Further, as the majority aptly noted, Kimball Hill never submitted any plan to the review committee. Kimball Hill simply made a poor business decision in a time of rapidly escalating home and lot prices.
The remedy initially attempted by Kimball Hill was to seek more money from Leopold. This flies in the face of the implied duty of good faith applicable to almost every contract. See Sepe v. City of Safety Harbor, 761 So.2d 1182, 1184 (Fla. 2d DCA 2000).
*139 If Leopold was an unreasonable buyer, then the remedy available to Kimball Hill was one for breach of contract. Alternatively, if this had been simply an agreement to agree, then the Leopold claim for fraud in the inducement would have been a triable issue.
Lastly, Cavallaro v. Stratford Homes, Inc., 784 So.2d 619 (Fla. 5th DCA 2001), is distinguishable for several reasons, the most obvious of which is the trial court's finding that the parties in that case never had a signed agreement.
FULMER, Judge, Dissenting.
I would affirm the final judgment and, therefore, respectfully dissent. In this appeal, we are asked to review a final judgment entered after a two-day nonjury trial in which the trial court was required to resolve mixed questions of law and fact and during which much conflicting testimony was presented. The trial court's determinations come to this court endowed with a presumption of correctness, and it is not the prerogative of this appellate court, upon a de novo consideration of the record, to reevaluate the testimony and evidence and substitute its judgment for that of the trial court. Brandenburg Inv. Corp. v. Farrell Realty, Inc., 463 So.2d 558, 560 (Fla. 2d DCA 1985). And, while this court is not required to defer to the trial court's conclusions on pure questions of law, Walter v. Walter, 464 So.2d 538, 539 (Fla.1985), the trial court's findings of predicate facts upon which its legal conclusions are based must be accepted by this court if supported by competent evidence, Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976).
The trial court's final judgment recites sixteen findings of fact, which are not challenged on appeal, and eight conclusions of law. One of the undisputed findings is that a model plan for a home identified as the Stratmon V did not exist at the time the agreement was executed. The majority acknowledges that "the parties agreed that the design would be created," but the majority apparently concludes that the design for the home to be built was not an essential term of the agreement. The majority states:
The fact that the Stratmon V plans did not exist at the time that the contract was signed or that the options to be added were not listed, does not mean that essential terms were omitted. Every potential contingency does not need to be addressed in order for there to be an enforceable contract.
What constitutes the essential terms of an agreement must be evaluated on a case-by-case basis. Giovo v. McDonald, 791 So.2d 38, 40 (Fla. 2d DCA 2001), review denied, 817 So.2d 848 (Fla.2002). In this case, it is inconceivable to me that the design of the home to be constructed could be considered anything other than an essential term of the Leopolds' agreement with Kimball Hill Homes, Inc. (Kimball Hill). If the design of the home is an essential term, as both the trial court and I conclude, the undisputed evidence shows that the parties had no agreement on that essential term at the time the agreement was executed and never, during subsequent negotiations, reached a meeting of the minds regarding the design of the home to be constructed. Thus, in my view, the trial court was both factually and legally correct in finding that "there was no meeting of the minds regarding the completed price and type of home to be constructed" and also in citing to Cavallaro v. Stratford Homes, Inc., 784 So.2d 619 (Fla. 5th DCA 2001), in support of this finding.
The majority addresses the trial court's reliance on Cavallaro by first observing that in Cavallaro, the agreement "failed to contain the requisite essential terms such *140 as the purchase price and design of the home, and the terms and conditions of construction." Without explanation, the majority then purports to contrast the agreement we are reviewing by stating that "the contract at issue here included the price ($390,000) and the type of home (Stratmon V). The parties also agreed upon specific terms and conditions of construction." Because the design of the home labeled Stratmon V did not exist when the agreement was executed, I cannot concur with the majority's conclusion that the agreement included the essential term of the "type of home" to be built. Therefore, I agree with the trial court's conclusions that "essential terms of the contract remained open for further consideration.... there was no meeting of the minds regarding the completed price and type of home to be constructed," and "[a]ny representations made by [Kimball Hill] concerning the Stratmon V were negotiations concerning further plans to be approved by both parties." If an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Truly Nolen, Inc. v. Atlas Moving & Storage Warehouses, 125 So.2d 903, 905 (Fla. 3d DCA 1961).
In setting forth the facts of this case, the majority draws extensively, but not exclusively, from the trial court's findings of fact. These facts have not been presented by the majority in the light most favorable to the prevailing party, as this court is required to do. See Seaside Cmty. Dev. Corp. v. Edwards, 573 So.2d 142, 146 (Fla. 1st DCA 1991) (noting that a reviewing court must disregard conflicting evidence and accept the facts in evidence which are most favorable to the party that prevailed at trial).
The evidence presented at trial reveals that the contract with the architectural firm called for the work to be performed in three phases, each of which was to be completed in four weeks. The first phase involved preparation of a schematic design, conceptual floor plan, and elevation. Phase two was the design development phase. Phase three involved the preparation of a set of construction documents. Approvals are usually obtained after each phase. The residential designer, Heather Attardo, testified that during the work on phase one she became concerned as Mrs. Leopold continued to make numerous revisions that differed significantly from the original concept. Her concerns were expressed to Mrs. Leopold. Ms. Attardo also advised Mrs. Leopold that the construction cost of the revisions would be significant.
After nine weeks of work, the Leopolds were told by the architectural firm that they would be billed hourly because the numerous and significant changes Mrs. Leopold continued to make had caused the number of hours for completing phase one to be exceeded. An attempt was then made to finalize a concept during two meetings that spanned about six hours. The resulting floor plan was presented to Mrs. Leopold for approval on December 6, 1999. Ms. Attardo testified that "even though the conceptual phase or schematic design plan was not completed, I felt with as many design changes that we had made since September 1st, that I needed Mrs. Leopold to sign off on the floor plans before I even designed an elevation." Ms. Attardo testified that she also suggested that Mrs. Leopold take the floor plan to Lakewood Ranch and get approval so that additional time and money would not be wasted on completing the remaining work in phase one if the floor plan was not going to be accepted.
The record reflects that this conceptual floor plan was now significantly different *141 from the other homes in the subdivision and from the original concept presented by Mrs. Leopold in May 1999. For example, the Leopolds' proposed design had a 50-foot by 109-foot footprint as contrasted to the 50-by 70-foot footprints of the model homes. The design also included an additional 300 square feet of unairconditioned space. It was this schematic design, without elevation, that was presented to Mr. Morris on December 7, 1999. Upon seeing the schematic design, Mr. Morris exclaimed, "Oh, my gosh." During his testimony, Mr. Morris noted the dramatically irregular shape and observed that if the next door neighbors built a Stratmon or Sterling model, they would not be able to see the total lake. He noted that there was "no way this would blend in" with the other homes in the neighborhood. He also pointed to an area on the floor plan and commented, "that's supposedly unair-conditioned space with a bathroom, a bedroom, and a utility." Ms. Attardo had testified that this area "was intended to be unair-conditioned space so that the Leopolds could get within the square footage requirements of Edgewater Sound." Mr. Morris testified that he declined to present the design to the Planning Review Committee because "[t]hey'd think I was trying to pull one over on them."
The record reflects that Mr. Morris asked for a meeting with the Leopolds and told them he could not build this home because "it is too far out." He offered to refund their deposit money as well as all the money they had expended with the architectural firm. The Leopolds responded by first inquiring about the possibility of building a Lyndale Plus model, which was a home offered in another Kimball Hill subdivision. However, because of modifications requested by the Leopolds to that existing plan, the price quoted by Kimball Hill exceeded that which the Leopolds were willing to pay. The parties continued to negotiate, and the Leopolds next requested the construction of a Stratmon I model but did not wish to pay the increase requested by Kimball Hill over the original contract price. The majority suggests that Kimball Hill should have been bound by the base sales price quoted in the original contract for a Stratmon V, presumably because the base price was derived from the price of a Stratmon I. However, during the period between the execution of the original agreement and the discussion about the building of a Stratmon I, the base price of the Stratmon I had increased. The increase requested by Kimball Hill represented only the difference in the price at which the Stratmon I was offered almost nine months earlier, when the Leopolds entered into the agreement to purchase a Stratmon V, and the current price at which the Stratmon I was now listed. Kimball Hill did not increase the price of the lot nor did Kimball Hill ever seek to increase the prices quoted in the original agreement for a Stratmon V.
Because the parties were unable to reach agreement on plans for a Stratmon V and were unable to negotiate a new contract for construction of any alternative existing model, Kimball Hill again offered the Leopolds a refund of not only their deposit, as provided for in the default provision of the agreement, but also all fees paid to the architectural firm, which it appears Kimball Hill was not legally obligated to refund. When the Leopolds failed to respond to a letter from Mr. Morris, Kimball Hill sought the declaratory relief in the trial court that has resulted in this appeal.
Based on my reading of the trial transcript, I conclude that there is more than sufficient evidence in this record to support the trial court's findings of fact, and those facts support the conclusions of law *142 set forth in the final judgment. Therefore, I would affirm the final judgment.
NOTES
[1] Notwithstanding the changes to the financing contingency clause, the Leopolds subsequently decided against obtaining a mortgage for the house.
[2] It is interesting to note the increase in value of Lot 33 during the relevant time frame. Testimony at trial revealed that the value of Lot 33 on May 30, 2000 (close to when the complaint was filed) was $210,000 and the value on June 21, 2001 (the time of the trial) was $240,000. Mr. Morris acknowledged that from the time the Homebuyers Agreement was signed, when Lot 33 was priced at $115,000, Kimball Hill had created a market that drove up the sales prices of lots at Edgewater.