905 So.2d 226 (2005)
Rigoberto ACOSTA, et al., Appellants,
v.
The DISTRICT BOARD OF TRUSTEES OF MIAMI-DADE COMMUNITY COLLEGE, and Dr. Norman Rose, Appellees.
No. 3D03-3042.
District Court of Appeal of Florida, Third District.
May 25, 2005.
Rehearing and Rehearing Denied July 13, 2005.
*227 David Helfand, Rockville, MD; and Nancy C. Wear, for appellants.
Hinshaw & Culbertson, and Marissa I. Delinks, Fort Lauderdale, for appellees.
Before GREEN, RAMIREZ, and SHEPHERD, JJ.
Rehearing and Rehearing En Banc Denied July 13, 2005.
RAMIREZ, J.
Rigoberto Acosta, et al., all former students of the Medical Assistant Program at Miami-Dade Community College, appeal the trial court's entry of an adverse summary final judgment. Because the college never promised the students any definite tuition and the students nevertheless accepted the higher tuition, we affirm.
The students all graduated from the Medical Assistant Program at the college's Medical Center Campus. The students represent the program's second class that began the two-year program in August of 1999 and graduated with an Associate in Science degree in 2001. Each of the students paid over $18,000.00 to obtain this degree. Dr. Norman Rose, a former practicing general surgeon, was the Program and Medical director.
In an acceptance letter to prospective Program applicants sent out in May 1999, Dr. Rose advised the applicants that "[d]ue to the increased cost [of] this program, it will be necessary to increase the tuition costs of the program." Dr. Rose explained that "[a]t this particular time the exact amount of the increase has not been finalized, though it will be greater than what the original cost of the program was advertised. It still should be a very economical program and be under $6,000 for the two years of education." Dr. Rose also requested the prospective students sign an "Acceptance Letter" which he enclosed in his communication that stated that they were "aware of the increase in the cost of the program." If the applicant did not sign and return the enclosed Acceptance Letter by registered mail within two weeks, Dr. Rose stated that "it will be necessary to offer this position to one of the alternates for the program." The Acceptance Letter stated that the students, "realizing that the cost of the Physician Assistant Program at Miami-Dade Community College, Medical Center Campus, will increase, do accept the position offered [them] to enter the class of August, 1999." All of the prospective students signed and returned the enclosed form.
On July 26, 1999, Dr. Rose informed the students that the college had "hired additional full-time faculty bringing the number to five." Dr. Rose added that the faculty *228 staff included a Doctor of Pharmacology and a Certified Pathologist. Additionally, Dr. Rose informed the students that the college had: (1) contracted surrogates for male and female examinations, (2) upgraded the human patient simulator at a cost of $16,000.00, in addition to the original $230,000.00, (3) and was currently arranging for the purchase of a pediatric model of the human patient simulator at a cost of $140,000.00. Dr. Rose also informed the students that the "special fee added to the current tuition amount[ed] to $280 per credit hour" which would raise the students' "first semester tuition by $2,800.00." The Program outline which Dr. Rose enclosed with his communication indicated that the total cost of the Program was $18,543.10. Prior to the commencement of the Program's classes and prior to any tuition having been paid by the students, the college held an orientation for the students in which the college reiterated the reasons for the increase in the Program's cost. With this knowledge in hand, two students decided not to attend the Program, while thirty-one, all appellants in this cause, proceeded with the Program, paid the tuition, and graduated as Medical Assistants.
In 2001, the students sued the college and Dr. Rose for breach of contract, fraud in the inducement, violation of various sections of Florida Statutes and Florida's administrative code, and later promissory estoppel. The defendants moved for summary judgment on all counts, which the trial court granted.
"The rule is generally recognized that for the parties to have a contract, there must be reciprocal assent to certain and definite propositions." Truly Nolen, Inc. v. Atlas Moving & Storage Warehouses, Inc., 125 So.2d 903, 905 (Fla. 3d DCA 1961). "It is well established that a meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract...." Greater New York Corp. v. Cenvill Miami Beach Corp., 620 So.2d 1068, 1070 (Fla. 3d DCA 1993). What constitutes "the essential terms will vary widely according to the nature and complexity of each transaction and will be evaluated on a case by case basis...." Socarras v. Claughton Hotels, Inc., 374 So.2d 1057, 1060 (Fla. 3d DCA 1979). However, price is generally recognized as an essential element to a contract. See Leopold v. Kimball Hill Homes Florida, Inc., 842 So.2d 133, 138 (Fla. 2d DCA 2003). As there was no price quoted in the contract, there could be no contract. Appellees thus cannot be found to have breached it.
We also affirm as to all other counts. There was no evidence of fraud presented in this record and, as to promissory estoppel, that count suffers from the same infirmity as the breach of contract count. W.R. Grace and Co. v. Geodata Servs., Inc., 547 So.2d 919, 924 (Fla.1989)(rejecting the application of promissory estoppel because the promise was not sufficiently definite as to terms and time).
The dissent relies on Payne v. Humana Hosp. Orange Park, 661 So.2d 1239, 1241 (Fla. 1st DCA 1995) for the proposition that, when a contract fails to fix a price, a reasonable price is implied. We agree. However, a careful reading of the appellants' second amended complaint does not contain any allegation that the tuition was unreasonable. In fact, the college has asserted without contradiction that, even at a total of over $18,000, its program was the most economical in the State of Florida.
Additionally, even if we assume that there was a valid and enforceable contract in this case, the students, through their conduct, by commencing the program, satisfying all their course requirements, and eventually graduating, may be *229 held to have acquiesced to the higher tuition. "Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement." New Jersey v. Gloucester Envtl. Mgmt. Servs., 264 F.Supp.2d 165, 177-78 (D.N.J., 2003).
Affirmed.
GREEN and RAMIREZ, JJ., concur.
SHEPHERD, J. (concurring in part and dissenting in part).
I am in agreement with the majority that the lower court properly granted summary judgment for MDCC as to the fraud in the inducement count for lack of evidence to support the claim. However, I respectfully dissent on the summary affirmance of the breach of contract and promissory estoppel claims. I believe that the majority opinion not only condones an injustice to the students of the type the quasi-contractual relief sought here is designed to rectify, but also that the majority fails to sufficiently credit a genuine issue of material fact on which this case should be permitted to proceed to a jury. Fla. R. Civ. P. 1.510.
I agree with the majority's rendition of the facts. However, I believe some other elements of the story are also pertinent. At the time the students submitted their applications during the 1998-99 school year, the MDCC official brochure advised students that the total cost of the two-year Physicians' Assistant Program would be $5,032.50, a sum that included "all books and equipment necessary for the program."
In May 1999, the students who were admitted into the school, including the plaintiffs here, received acceptance letters that stated:
... [d]ue to the increased cost of this program, it will be necessary to increase the tuition costs of the program. At this particular time the exact amount of the increase has not been finalized, though it will be greater than what the original cost of the program was advertised. It still should be a very economical program and be under $6,000 for the two years of education.

If you decide to accept entrance into the program, then it will be necessary for you to sign the enclosed document which states that you are aware of the increase in the cost of the program. This document must be sent by registered mail to us within two weeks. If we have not received confirmation from you in that period of time, it will be necessary to offer this position to one of our alternates for the program.
(emphasis added). By the terms of these letters, the students were each required, under pain of forfeiting their place in the entering class, to sign and return an acceptance letter within two weeks, acknowledging that they were "aware of the increase in the cost of the program." Each student signed and returned the requested acknowledgment.
In my opinion, a binding contract was created by these two instruments. Cf. Sharick v. Southeastern Univ. of Health Sciences, Inc., 780 So.2d 136 (Fla. 3d DCA 2000) (relationship between student and university is contractual in nature). MDCC's May 1999 offer letter clearly expresses an intent to bind both MDCC and the plaintiff students. See Webster Lumber Co. v. Lincoln, 94 Fla. 1097, 115 So. 498 (1927) (both parties to a contract must assent to same thing in same sense and their minds must meet as to the terms). The elements of a contractual agreement *230 offer, acceptance and considerationare all present. Med-Star Cent., Inc. v. Psychiatric Hospitals of Hernando County, Inc., 639 So.2d 636, 637 (Fla. 5th DCA 1994). The letter contained definite time-related terms as both parties were contemplating entering the Fall 1999 class, matriculating in Spring 2001. The letter, which the students signed and promptly returned, also spoke of consideration and stated the cost would be more than the "original cost ... advertised," but "under $6,000." Then, to the students' astonishment, MDCC unilaterally tripled the cost of the program as classes were preparing to commence.[1]
The majority opines that no contract existed because the college never promised the students any definite tuition. The majority is correct that price is generally recognized as an essential element to a contract. See Leopold v. Kimball Hill Homes Florida, Inc., 842 So.2d 133 (Fla. 2d DCA 2003). However, on the facts of this case, I believe the majority is incorrect to conclude that because "no price [was] quoted, ... no contract [existed]." The undisputed facts reveal that prices were quoted; in fact, a range of $5,000 to $6,000 was given as costs for the two-year program. I believe this price term is sufficient.
In Med-Star, supra, the breaching party asserted that the language of the proposal was too "speculative and futuristic in nature" to be a definite contract. The breaching party argued that it had not intended to enter into a binding contract when it signed the proposal. The court found that subjective intent was not determinative, but what a "reasonable person in the position of the parties would have thought it meant." Med-Star, 639 So.2d at 637. In reversing the grant of a summary judgment, the court found that a "reasonable person, in the position of Med-Star, could have thought that by signing the proposal, Psychiatric Hospitals accepted its offer and meant to be bound by its terms." Id. Similarly, here, the students signing the acceptance letter creates a controversy of fact as to whether they were accepting the increase in cost up to $6,000, or accepting an increase of cost indefinitely.
Even if the quoted figure is not a finalized price, the failure to establish a final price is not fatal to the formation of a contract. When a contract fails to fix a reasonable price, a reasonable price can be implied. Payne v. Humana Hosp. Orange Park, 661 So.2d 1239, 1241 (Fla. 1st DCA 1995), citing McGill v. Cockrell, 88 Fla. 54, 101 So. 199, 201 (1924)(where a contract fixes no definite sum to be paid for services, "a reasonable sum is presumed by law to have been contemplated by the parties"); cf. 19A Fla. Stat. Ann. 218 (1993)(§ 672.305(2): "A price to be fixed... means a price ... to fix in good faith."), cmt. at 219 ("This seemingly unnecessary admonition was included to deny to the seller the unbridled license to fix any exorbitant or unreasonable price he may wish.").
*231 In Payne, the plaintiff brought suit against a hospital where he had received medical services, alleging that Humana charged unreasonable sums for pharmaceuticals, medical supplies and laboratory services. The appellate court reversed the dismissal of two counts of the plaintiff's case, finding that a patient is not bound by unreasonable charges found in a long list of pills, supplies, and services, where he merely agreed to pay charges in accordance with standard and current rates in the hospital's agreement. The court found that a contract existed although no firm prices were established on the front end of accepting hospital treatment. The court also agreed to impute reasonable prices where the contract was not specific.
The students' posture is not very different than the plaintiff's in Payne. The students too had checked into a college, perhaps knowing that it would cost as much as $6,000 or perhaps not knowing the total cost. In either case, a contract very much existed; the only question is whether the amount finally charged was reasonable or unreasonable. Viewing the May 1999 letter from either perspective, a contract was created, and this dispute should be presented to a jury.
Furthermore, I believe that a promissory estoppel claim was properly pled and that the same fact issues would allow the case before a fact-finding jury. Claims for breach of contract and promissory estoppel are alternatives for each other; the doctrine of promissory estoppel arises where the requisites of contract are not met, yet the promise should be enforced to avoid injustice. Doe v. Univision Television Group, Inc., 717 So.2d 63 (Fla. 3d DCA 1998).
The basic elements of promissory estoppel are set forth in the Restatement (Second) of Contracts, § 90 (1981), which states:
(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
The character of the reliance protected is explained as follows:
The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promissee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.
See also Leonardi v. City of Hollywood, 715 So.2d 1007, 1008-09 (Fla. 4th DCA 1998)(finding that an employee at will does not have a promissory estoppel claim against a former or future employer as a matter of law).
Here, the students clearly relied on the May 1999 letter of acceptance to make life-changing decisions. Some undoubtedly relinquished offers from other schools that they might perhaps have accepted had they known the true price of MDCC's new program. Others might have terminated their employment or deferred employment, or changed housing arrangements in anticipation of starting MDCC in the fall. Likewise, MDCC knew that students would rely on the May 1999 acceptance letter to make a decision in favor of MDCC, since the letter offered the comparatively *232 lower price tag of "under $6,000," ensuring that the best possible applicants would apply at MDCC over Barry University or Nova Southeastern University. It was only after the prospective students had made life-altering decisions and foregone acceptance to other universities that MDCC revealed the $18,000 price tag at orientation. The $18,000 price tag is so jarringly different from the "under $6,000" quote that a grave injustice is perpetrated upon the students when it is literally too late to withdraw from the program and meaningfully pursue other alternatives. As such, the facts here exemplify the need for promissory estoppel to prevent a great inequity. See Doe, 717 So.2d at 63.
Courts ... must find a ... role that acknowledges the consumer nature of the student-university relationship and demands more accountability from the institution. After all, students potentially have foregone other opportunities and purchased an education product based on promises and on representations that the institution made to induce them to enroll....
Hazel Glenn Beh, Student Versus University: The University's Implied Obligations of Good Faith and Fair Dealing, 59 Md. L.Rev. 183, 224 (2000), as cited in Sharick, 780 So.2d 136, 142 (Ramirez, J. concurring). We have not been asked to review the college's academic independence, but rather its flip-flop business decisions which have caused substantial turmoil in the lives of its students. Accordingly, I would reverse the lower court in its entry of summary judgment on both the promissory estoppel and breach of contract claims.
NOTES
[1] Fall classes at MDCC actually begin in middle to late August of each year. MDCC asserts that it endeavored to reach each student by letter during the last week of July 1999. Many of the plaintiff students claim they did not learn of the increase until orientation. According to one witness, "[P]eople were angry and crying.... They did not know how they were going to afford it." Anticipating this state of affairs, college administrators, including the President of the MDCC Medical Campus, attended the orientation to try to pacify the students. They also brought a loan officer from a local bank to discuss additional financing with the students. At this time two students dropped out of the program and the others, having abandoned their alternatives to credit the students' version of this case, began classes and banded together to sue the college.