State of NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiffs,

v.

GLOUCESTER ENVIRONMENTAL MANAGEMENT SERVICES, INC, Defendants.

United States of America, Plaintiff,

v.

Air Products and Chemicals Incorporated, et al., Defendants.

Civil Nos. 84–0152 (JBS), 92–3860(JBS).

United States District Court, D. New Jersey.

May 29, 2003.

---

Gary J. Lesneski, Esquire, Craig Huber, Esquire, Archer & Greiner, P.C., Haddonfield, NJ, for the GEMS Phase II Trust.

Peter C. Harvey, Acting Attorney General of New Jersey, By: Mark D. Oshinskie, DAG, Trenton, NJ, for the New Jersey Department of Environmental Protection.

Patricia C. Hick, Esquire, New York, N.Y. and Brian G. Donohue, Sr. Attorney, Washington, DC, for the United States Environmental Protection Agency.

Lisa M. Kmiec, Solicitor, Camden, NJ, for Camden County Municipal Utilities Authority.

Howard Long, Jr., Esquire, Wade, Long, Wood & Kennedy, LLC, Laurel Springs, NJ, for Gloucester Township Municipal Utilities Authority.

### *OPINION*

SIMANDLE, District Judge.

This matter comes before the Court upon the GEMS Phase II Trust's motion to enforce the Consent Decree entered into by the parties in 1997, after a long period of negotiations, regarding the remediation of the Gloucester Environmental Management Services, Inc. ("GEMS") Landfill located in Gloucester Township, New Jersey, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA" or "Superfund"), 42 U.S.C. § 9601, *et seq.,* and other federal environmental laws. As required by the Consent Decree, the Trust has carried out its obligation to construct the Groundwater Extraction ("GWE") system, and wishes to implement the selected remedy of discharging the pretreated effluent through the Gloucester Township Municipal Utilities Authority ("GTMUA") sewage collection system for final treatment at the Camden County Municipal Utilities Authority ("CCMUA") sewage treatment plant.

Although the CCMUA, the New Jersey Department of Environmental Protection ("NJDEP"), and the United States Environmental Protection Agency ("EPA")

agree that the remediation plan of the landfill contained in the Consent Decree should not be delayed, the GTMUA opposes the motion because it contends that the Trust has materially breached the Sewer Service Agreement entered into by those two parties on May 28, 1997, by failing to comply with contractually required conditions. Further, the CCMUA, although it is a regional treatment authority, argues that it has not received a legal mandate to accept the pretreated effluent from this landfill.

For the reasons discussed herein, the Trust's motion to enforce the Consent Decree will be granted, and the CCMUA and NJDEP will be directed to finalize the proposed draft CCMUA permit within thirty (30) days of today's date. Further, the GTMUA will be directed to comply with its obligations under the Sewer Service Agreement.

## I. BACKGROUND

### A. The GEMS Landfill, Owned by Gloucester Township

This case involves the sixty-acre Gloucester Environmental Management Services, Inc. ("GEMS") Landfill located in Gloucester Township, Camden County, New Jersey, which was owned by the Township of Gloucester and operated by Amadei Sand & Gravel, Inc., and GEMS, in the late 1950s through the 1980s. *See State of New Jersey Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs. Inc.*, 719 F.Supp. 325, 328 (D.N.J.1989). The NJDEP originally brought the case in New Jersey Superior Court in 1980, seeking proper closure and remediation of the landfill which was caused by the dumping of hazardous wastes; the case was eventually removed to federal court in 1984. *Id.* The United States also filed suit for recovery of response costs and other remedies under CERCLA in 1992. The State and Federal cases were combined and coordinated for all purposes. Several hundred parties were joined as alleged generators or haulers of wastes to the GEMS landfill, including many municipalities in Southern New Jersey, industrial plants, waste processing facilities, trucking companies and other institutions, both private and public. The intensive exchange of pretrial discovery and the scientific and engineering studies led to the preliminary (Phase I) remediation settlement in 1989 and the final (Phase II) remediation settlement in 1997, at issue in this motion, described below, to provide for the cleanup of the GEMS landfill, financed by the responsible parties, over a 30–year period.

### B. The 1997 Consent Decree

On June 27, 1997, the parties to the suit entered into a Consent Decree, which had been negotiated over an extensive period of time, undergoing a period of public comment and review and a hearing, during which time no objection was raised with respect to the proposed remediation plan for the landfill. The terms of the Consent Decree required the construction of a Groundwater Extraction System ("GWE") and an On–Site Groundwater Pre–Treatment ("OSPT") System as shown in the Pre–Trial Remedial Design Report which was attached to the Consent Decree, and the operation of the GWE and OSPT systems with discharge of the treated water to the GTMUA sewerage system for final treatment at the CCMUA. (Consent Decree, § V, ¶ 11, Trust App. Ex. A.) This remedial action, including the extraction and treatment of contaminated groundwater underlying the site, was selected by the EPA, with concurrence by the NJDEP, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA" or "Superfund"), 42 U.S.C. § 9601, *et seq.*

## C. *The GTMUA Sewer Service Agreement*

In addition, the GTMUA and the Trust executed a Sewer Service Agreement ("Sewer Agreement") on May 28, 1997, which permitted the discharge of treated effluent from the GEMS Landfill to flow through the GTMUA's sewage system, and required the Trust to pay a $400,000 one-time connection fee along with annual user fees. The Sewer Agreement was attached to and was made part of the Consent Decree, (Sewer Agreement, Trust App. Ex. B), and provides that the "Court having continued jurisdiction over the GEMS matter shall have jurisdiction over any disputes arising out of this Agreement." (*Id.* ¶ 39.) Paragraph 15 of the Sewer Agreement provides that the GTMUA has the right to utilize a "plug valve" to shut off the landfill flow to the GTMUA's system for situations deemed to be "emergencies," including, but not limited to, "overflowing of wetwells, main breaks, pump station failures, generator failures, pumping beyond allowable rates and Acts of God." (*Id.* ¶ 15.)

The Trust paid the $400,000 connection fee to the GTMUA in two installments, and also paid its connection fee of over $1.7 million to the CCMUA, receiving from the CCMUA a permit for discharge. (Lee Aff., ¶ 3, Trust's App.) In addition, as of June 1999, the Trust constructed the GWE and OSPT systems, according to the terms of the Consent Decree, and prepared to begin the one-year "start-up" phase. (*Id.* ¶¶ 3–4.)

## D. *The Discovery and Remediation of Radionuclides*

Prior to the start-up phase, the CCMUA requested that samples of effluent from the landfill be analyzed for radionuclides. In late 1999 to 2000, a series of tests indicated low levels of radionuclides[1] in the wells of the landfill, raising concerns with federal, state and local agencies. The analysis indicated the low level presence of gross alpha and gross beta particle activity, causing the CCMUA to issue a Cease and Desist Order on June 15, 1999, prior to the start-up. (Cease Discharge Notice, 6/15/99, Trust's App. Ex. D.) The CCMUA subsequently informed the Trust that it was sending the radionuclide data to the EPA and NJDEP for confirmation that the radionuclide levels found in the discharge would be acceptable for the system. (Kricun Letter, 7/6/99, Trust's App. Ex. E.)

The Court convened a conference in March 2001, at which the Trust, the EPA, the NJDEP, and the CCMUA, agreed to negotiate a plan to proceed with a baseline study and trial operation of the OSPT, with the effluent going to the CCMUA. (Lee Aff., ¶ 8, Trust's App.) The parties were subsequently involved in nearly a year-long negotiations process, which also determined what levels of radionuclides would be permitted during the trial operation of the OSPT. In July 2000, the Trust's radiation expert Van Pelt Associates issued a report regarding the existence and concentrations of radionuclides in the GEMS area groundwater. (Lee Aff., ¶ 9, Trust's App.) The CCMUA also enlisted its own radiation consultant to develop a

---

**1.** Radionuclides are chemical elements with unstable nuclei that release charged particles (ions), or emit electromagnetic radiation. *Fertilizer Inst. v. U.S. EPA,* 935 F.2d 1303, 1306 (D.C.Cir.1991); *see also* Sloane–Dorland Annotated Medical–Legal Dictionary, at 602 (1987). Radionuclides are present here in the form of radium, specifically radium–226 and radium–228, and uranium. According to the EPA, most drinking water sources have low levels of these radioactive contaminants. *See* EPA, Radionuclides in Drinking Water, at http://www.epa.gov/safewater/standard/pp/radnucpp.html.

discharge standard for radionuclides. (*Id.*) In August 2001, the CCMUA consultant proposed a discharge limit for radionuclides which would be applicable to the GEMS discharge during the trial operation of the OSPT.[2] (*Id.*)

The CCMUA then proceeded to public hearings regarding the proposed radionuclide discharge limits as recommended by its experts. The CCMUA had developed a Work Plan that proposed to govern the discharge of the GEMS effluent to the CCMUA, having received input from the EPA and the Trust, but no response or feedback from the NJDEP. (Kricun Letter, 11/30/01, Trust's App. Ex. F.) The CCMUA then sent a letter to the NJDEP on August 31, 2001 stating its intention to apply the proposed standard to the GEMS discharge, giving it a 45–day period in which to comment. (*Id.*) After the 45–day period, the CCMUA again notified the NJDEP of its intentions on October 25, 2001. (*Id.*) The NJDEP replied by letter dated November 1, 2001, indicating that it had technical concerns regarding the CCMUA consultant's study, but stating that it would not share those concerns at that time. (*Id.*) The parties were unable to reach agreement on the standard to be applied. (Quinn Decl. ¶ 26.)

In fall 2002, the CCMUA adopted the more stringent drinking water standards (MCLs) as the standard it would apply to radionuclides associated with any discharge from the GEMS Landfill. (CCMUA Public Responsiveness Summary, October 2002, Trust's App. Ex. J.) The CCMUA notified the NJDEP and the EPA of its position that it would not accept the groundwater unless "all radionuclides are removed *on-site* to meet drinking water standards, and all other pollutants are removed *on-site* to meet normal industrial sewerage standards." (*Id.*)

Meanwhile, the Trust submitted an application to the NJDEP in the summer of 2001 to permit the discharge of treated effluent from the OSPT System by surface water to Holly Run on a trial basis, as a contingency plan in the event the sewer trial could not be realized. (Lee Aff., ¶¶ 11, 12, Trust's App.) The original proposed sewer trial would have provided for pre-treatment of the landfill and discharge of the water into the CCMUA system, whereas the contingency surface water trial would treat the water on-site and discharge it to Holly Run. A stipulation providing for a six-month sewer trial was submitted to the Court in March 2002, though a regional drought problem surfaced and the parties agreed to postpone the sewer trial. (Lee Aff., ¶ 14, Trust's App.) The parties thus agreed to implement a 90–day surface water pilot study, for which the Trust had previously obtained a surface water permit. The Trust additionally added a solids removal system to its OSPT system to facilitate the removal of suspended solids from the effluent. (Lee Aff., ¶ 15, Trust's App.) The discharge to the CCMUA consequently never occurred, while the temporary pilot discharge of treated effluent to Holly Run went forward. (Quinn Decl. ¶ 31.)

The surface water pilot study commenced on April 10, 2002, and continued

---

2. The discharge limits proposed by CCMUA's consultant were more stringent than the limits allowed by the NJDEP regulations governing the discharge of radionuclides to sanitary sewers pursuant to N.J.A.C. 7:28–11.2, the levels of which are 400 pCi/L (picocuries per liter) for radium–226; 800 pCi/L for radium–228; 70,000 pCi/L for radium–224; and 20,-000 pCi/L for uranium. (Quinn Decl. ¶¶ 24, 28.) The levels contained in the CCMUA's proposed permit were 42 pCi/L for radium–224; 60 pCi/L for radium–226; 42 pCi/L for radium–228; 220 pCi/L for uranium–238. (*Id.*) This data is summarized in Table 1, *infra*. The temporary discharge to CCMUA never occurred, however. (Quinn Decl. ¶ 31.)

for eight months.[3] (Lee Aff., ¶ 14, Trust's App.) During that time, in accordance with the pre-approved testing protocols, the Trust pumped and tested from the groundwater extraction wells, monitored weekly the readings they obtained of the effluent from and influent into the OSPT, and analyzed the levels of radionuclides in the treated groundwater. (*Id.* ¶ 15.) The Trust's engineering evaluation[4] of December 20, 2002 confirmed that the effluent from the OSPT System met drinking water standards ("MCLs") for radionuclides:[5]

> Radionuclides are below the permit equivalent limits, which are the same as drinking water quality for radionuclide parameters. Routine monthly reports are submitted to the USEPA and NJDEP pursuant to the agency-approved Work Plan for Discharge to Surface Water Pilot Study and the surface water discharge permit equivalent. These reports continue to show compliance with the permit equivalent limits including radionuclides, except for the non-radiological parameters [total dissolved solids, ammonia, and chemical oxygen demand] noted above.

Of note, the GEMS treatment plant effluent data have consistently demonstrated that with the addition of solids removal (rather than solids return as originally provided for in the constructed design), the plant is capable of meeting Maximum Contaminant Levels (MCLs, i.e., drinking water quality) as

3. After it became clear that the groundwater would not attain steady state conditions within 90 days, the Trust requested approval to operate the pilot program for a longer time. The Deputy Regional Administrator of EPA, Region II, issued a Determination under Section VII of the Consent Decree requiring that the pilot program continue until January 10, 2003. (EPA Determination, 7/9/02, Trust's App. Ex. H; Quinn Decl. ¶ 35.) The state approved the Determination after consulting with the EPA. (EPA Determination, 7/9/02, Trust's App. Ex. H; Quinn Decl. ¶ 35.)

4. The Work Plan for Additional Response Actions, submitted by the GEMS Trust to the EPA in July 2002, provided for additional work divided into three categories: 1) continued operation of the existing treatment plant on a temporary basis, until steady state conditions were achieved, to definitively characterize influent; 2) an engineering evaluation, based on refined groundwater flow modeling, of alternatives for management of collected site groundwater; and 3) detailed engineering design and pilot studies, if needed, following a decision regarding the point of discharge. (Discharge Alternatives Evaluation, GEMS Landfill, December 2002, at 1–1, Trust's App. Ex. I.)

5. The drinking water level, or Maximum Contaminant Level (MCL), for the isotopes radium–226 and radium–228 is 5 pCi/L, while the M.C.L. § for uranium is 30 pCi/L, as promulgated by the EPA in December 2000. *See* National Primary Drinking Water Regulations: Radionuclides, 65 Fed.Reg. 76,708 (Dec. 7, 2000) (Final Rule) ("Drinking Water Regulations"); *see also* 40 C.F.R. § 141.66; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 232 (D.C.Cir.2003) (rejecting challenge to EPA's promulgation of National Primary Drinking Water Regulations for radionuclides under the Safe Drinking Water Act). The Appendix to the New Jersey Groundwater Quality Standards, N.J.A.C. 7:9–6, refers to the radionuclides standard as being the prevailing Safe Drinking Water Standard, citing to N.J.A.C. 7:10–1 *et seq.* N.J.A.C. 7:10–5.1, in turn, indicates that the National Primary Drinking Water Standards are incorporated as the State Primary Drinking Water Standards, except as otherwise provided in that section.

The cumulative data containing the sampling from eight months of the OSPT operation indicates that the effluent levels entering Holly Run ranged from 1.75 to 4.73 pCi/L for radium, and from 2.33 to 9.68 pCi/L for uranium, which are below the drinking water standards. (Quinn Decl. ¶ 39; Discharge Alternatives Evaluation, December 2002, Figs. 2–1, 2–2, Trust's App. Ex. I.) These results are summarized in Table I in the text, *infra*.

the radionuclide permit limits for a discharge to the CCMUA. (Discharge Alternatives Evaluation, GEMS Landfill, at 2–1, Trust's App. Ex. I.) Thus, the engineering report found that radionuclides existed in low levels, met all the standards contained in the Permit received by the Trust, and furthermore, met the M.C.L. discharge standard for radionuclides. (*Id.* at Figures 2–1, 2–2.) The final data generated in December 2002 further confirmed that radionuclides pose no risk.[6] (Lee Letter, 1/24/03, Trust's App. Ex. M.) The results of the pilot study measurements of radionuclides compared with the various possible regulatory parameters discussed above are shown in Table I:

TABLE I: Radionuclides Contained in GEMS Landfill Pretreated Effluent (2002–03 Pilot Study)

| | Radium–226 | Radium–228 | Uranium |
|---|---|---|---|
| GEMS Pretreated Effluent | 1.75 to 4.73 pCi/L [7] | | 2.33 to 9.68 pCi/L |
| EPA Drinking Water Standards ("MCLs") | 5 pCi/L | 5 pCi/L | 30 pCi/L |
| CCMUA's Original Proposed Permit Levels | 60 pCi/L | 42 pCi/L | 220 pCi/L |
| NJDEP Sanitary Sewer Limits | 400 pCi/L | 800 pCi/L | 20,000 pCi/L |

The NJDEP, in a letter dated February 19, 2003, stated that its Bureau of Environmental Radiation ("BER") "believes that discharge to the CCMUA is an acceptable alternative." (Goodman Memo., 2/19/03, Trust's App. Ex. P.) The NJDEP continued, however, to request additional sampling and gathering of information. (Luzecky Letter, 3/4/03, Trust's App. Ex. Q.)

As the CCMUA had withdrawn its permit when the radionuclides issue arose, and the CCMUA and DEP were not in agreement regarding the conditions for accepting the discharge, the Trust filed a Motion to Enforce the Consent Decree on April 3, 2003. The Trust seeks an order of this Court to move forward with the permitting process so that CCMUA can issue a discharge permit which would allow pretreated effluent from the GEMS site to be directed to CCMUA's plant. The GTMUA submitted its opposition to the motion, arguing that the GEMS Trust has materially

6. The system failed for one day in December 2002 and developed a leak due to the unusually harsh weather conditions faced by this region, and the fact that the pilot study equipment was of a temporary nature. The system was shut off and did not function for less than a day. The Trust's counsel, Mr. Lesneski, represented at the hearing that a procedure of notification to the other parties would take place if any problems occurred in the future. (Hearing Tr. 5/15/03, at 30–32.) Such monitoring and disclosure requirements would also presumably be among the reasonable safeguards of any eventual CCMUA permit for this site.

7. The November–December 2002 data for the pilot study indicates that the concentration for radionuclides is tabulated as a total of the raw results of the individual readings for each of the isotopes radium–226 and radium–228. (Data Table, Lee Letter, Trust's App. Ex. M.) Therefore, the actual values for either component (Radium–226 or Radium–228) are even lower than the combined value reflected in the scientific findings.

breached the Sewer Service Agreement the two parties had entered into on May 28, 1997, by failing to comply with contractually required conditions. (GTMUA Br. at 2.) The EPA, meanwhile, on April 23, 2003, issued a letter to the Trust indicating that it should proceed with its efforts to obtain a permit from the CCMUA.[8] (Quinn Aff. ¶ 42 & Ex. 5.)

### E. Basis for GTMUA Opposition

GTMUA had originally expressed concern in its May 28, 2002 letter to the Trust regarding the radionuclide issue, in which it also stated its position that it preferred the on-site treatment of the radionuclides over the untreated discharge of the radionuclides through the GTMUA sewer system. (Long Letter, 5/28/02, Trust's App. G.) Anticipating (incorrectly) that the Trust would discharge untreated water into the GTMUA, the GTMUA stated that it would utilize a plug valve to discontinue flow from the on-site wastewater facility upon commencement of the discharge from the landfill to the GTMUA's sewer system, as the Sewer Agreement had provided for, discussed above. (*Id.*) The GTMUA also requested an additional $6 million from the Trust for future maintenance and upgrading of its sewer system to upgrade alleged deterioration. (Additional O & M Costs, *id.* Ex. B.)

The Trust responded in a letter of December 27, 2002, informing the GTMUA that the GEMS on-site pretreatment system had been operating on a trial basis since April 2002, and that data obtained from the trial indicated that the system, with the addition of a solids removal component, removes radionuclides to levels lower than found in drinking water. (Lesneski Letter, 12/27/02, Trust App. Ex. K.) The Trust thus asked the GTMUA to confirm that it would not interfere with the flow of the discharge from the GEMS site to the CCMUA. (*Id.*) No written response from the GTMUA was received.

The GTMUA later suggested at a subsequent conference with the Court that the Trust had not provided the GTMUA with reports, drawings and specifications as required by Paragraph 2 of the Sewer Agreement, which provides the following:

> The Trust must submit said Application [application pursuant to N.J.S.A. 40:14B–61 for connection to the sewage collection system] together with final plans and specifications to the Authority within 12 months of the entry of the Consent Decree and construction of the on-site facility must be commenced within twenty-four (24) months from EPA approval of the Remedial Design, or such other time as agreed to by the parties; otherwise, this Agreement shall terminate and be of no further legal effect.

(Sewer Agreement, ¶ 2, Trust's App. Ex. B.) The Trust had previously submitted drawings, specifications and plans for the connection point between GEMS Landfill and the GTMUA's sewage collection system to the GTMUA on March 10, 1998.[9]

---

**8.** The EPA's April 23, 2003 letter concluded that the on-site treatment plant at the GEMS Landfill Superfund Site, with the construction of a permanent solids removal facility, will treat the groundwater extracted from the site, including radionuclides, to a level that will meet the standards for drinking water. The EPA thus determined that the Trust should take the steps necessary to obtain the CCMUA permit in order to implement the remedy detailed in the Consent Decree. (EPA Letter, April 23, 2003, in Quinn Aff. Ex. 5.)

**9.** The GTMUA then sent its Approval Certification of the permit to the Trust in March 1999, when it requested the second portion of the one-time user connection fee, amounting to $200,000. (Benson Letter, 3/24/99, Trust's App. Ex. L.)

(DiPippo Letter, 3/10/98, Trust's App. Ex. L.) The Trust provided the GTMUA with the drawings, specifications and plans for the OSPT on April 2, 2003. (Lee Letter, 4/2/03, Trust's App. Ex. R.) This was confirmed at the hearing. (Hearing Tr. 5/15/03, at 57.)

The GTMUA reiterates this same argument in the instant motion, asserting that the Trust materially breached the Sewer Agreement by, *inter alia,* failing to submit to the GTMUA the final plans and specifications for the on-site pre-treatment wastewater facility from GEMS within twelve (12) months of the entry of the Consent Decree, under the terms of the Sewer Agreement. (GTMUA Br. at 3.)

### F. *Hearing on May 15, 2003: Stipulations*

Although, as stated by the parties, the discharge from the GEMS Landfill would constitute less than 1% of the load of industrial and residential waste taken by the CCMUA plant, which serves the industrial, commercial and residential sewage needs of over 600,000 people in Camden County, (Hearing Tr. 5/15/03, at 21), the impact of the GEMS Landfill on its surrounding communities nevertheless remains an important and vital issue, which has received the Court's careful attention.

The Court convened a hearing on the Trust's motion to enforce the Consent Decree on May 15, 2003.[10] As confirmed at the motion hearing, and as stated in the parties' submissions, there is no dispute that the eight-month test study of the GEMS groundwater treatment system, with the addition of the solids handling equipment, demonstrates that the levels of radionuclides in the treated GEMS ef-

fluent water meet the stringent drinking water standards, (Hearing Tr. 5/15/03, at 5, 6, 7–9, 25–26), and that the characteristics of the GEMS waste are indistinguishable from other types of waste received by the CCMUA plant from other sources. (*Id.* at 22.) The parties also agreed that no evidentiary hearing is required for resolution of this motion. (*Id.* at 6–7, 59, 60.) The NJDEP also represented that it desired to go forward, and that it neither intends nor wants to derail the permitting process. (*Id.* at 9, 17.) The CCMUA and EPA likewise agreed with this position, and expressed their support for going forward with the permit process, with the appropriate safeguards in place. (*Id.* at 20–23; 33–38.) All parties further agreed that there is nothing about the quantity, quality or nature of the GEMS Landfill effluent, when pretreated as in the pilot study discharge, that presents remarkable change from the conditions believed to exist when the Consent Decree was negotiated and approved in 1997. (*Id.* at 4–8, 25–27, 44.)

## II. DISCUSSION

### A. *Enforcing the Consent Decree*

The Trust moves to enforce the Consent Decree entered into by the parties and signed by the Court on June 27, 1997, requesting that the Court enforce the remedy contained within the Consent Decree, which provides the methodology to be employed for remediation of the GEMS Landfill in Gloucester Township, New Jersey. The Consent Decree entered into by the parties expressly provides for this Court's continuing jurisdiction over the

---

**10.** The Court also signed a consent order providing for limited intervention by the CCMUA, which had previously not been a party to the case, to respond to the Trust's motion and subject itself to the Court's jurisdiction with respect to the decision reached herein. (Order, 5/15/03.)

parties and the subject matter of the consent decree:

> This Court retains jurisdiction over both the subject matter of this Consent Decree and the Plaintiffs and the Settling Defendants for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XX (Dispute Resolution) hereof.

Consent Decree, ¶ 62, Trust's App. Ex. A. In addition, the Sewer Agreement provides for the Court's jurisdiction over any disputes over its terms:

> The parties agree that this Agreement was entered into as part of a judicially managed settlement and agree that any Court having jurisdiction over the GEMS matter shall have jurisdiction over any disputes arising out of this Agreement.

Sewer Agreement, ¶ 39, Trust's App. Ex. B. The Court's continuing jurisdiction over the Consent Decree and the Sewer Agreement is plainly established from interpreting the Consent Decree under ordinary contract law principles. *See Harris v. City of Philadelphia,* 47 F.3d 1311, 1323 (3d Cir.1995) (citing cases). In addition, it is a well-established principle that a court has jurisdiction to enforce the terms of its own consent decree, as a judicial decree. *See S.E.C. v. Hatch,* 128 F.R.D. 58, 60 (D.N.J.1989) ("[A] Consent Judgment is a judicial act and 'possesses the same force and character as a judgment rendered following a contested trial.' ") (quoting *Siebring v. Hansen,* 346 F.2d 474, 477 (8th Cir.), *cert. denied,* 382 U.S. 943, 86 S.Ct. 400, 15 L.Ed.2d 352 (1965)). As stated by the Supreme Court,

> A Consent Decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But *it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree* that is subject to the rules generally applicable to other judgments and decrees.

*Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (emphasis added). Here, it is undisputed by the parties that the Court retains jurisdiction over the Consent Decree and Sewer Agreement, and thus has the authority to enforce their terms as necessary.

 In this case, the Consent Decree describes the methodology to be employed in the remediation of the contamination found at the GEMS Landfill site in Gloucester Township, New Jersey. There is no dispute that the Trust has carried out its obligations under the Consent Decree, that is, that it has designed, constructed, and test run the GWE and the OSPT of the remedial system. In addition, the Trust has operated the system for almost nine months, utilizing a discharge to surface water method, and confirmed the characteristics of the effluent generated by the OSPT. The Trust has also negotiated and entered into a Sewer Agreement with the GTMUA in 1997 providing for the transmission of the pre-treated effluent to the CCMUA facility in Camden, New Jersey. The Trust also applied for and received an earlier Discharge Permit in order to permit the pre-treated effluent to be discharged to the CCMUA facility. No party asserts that the Trust has neglected to carry out its duties regarding the obligations for the operation of the system.

With respect to the concerns about the presence of radionuclides in the effluent which would be discharged to the CCMUA, the Trust has added a solids removal system to the OSPT which reduced the radium components detected in the groundwater below the landfill to levels below drinking water standards (MCLs) for radionuclides, as required by the CCMUA. In fact, as discussed above, the drinking water standards required by the CCMUA are much more stringent than those promulgated in the state regulations adopted by NJDEP for industries that discharge water containing radionuclides to sanitary sewer systems, pursuant to N.J.A.C. 7:28–11.2. (*See* Table I, *supra.*) The CCMUA's standards are even more stringent than the discharge limits proposed by CCMUA's own consultant for its previous study.

Importantly, at the motion hearing, no party disputed that the radionuclides issue has been resolved satisfactorily, and no party believes it is likely to be a problem in the future. There is no basis for concluding that the pretreated effluent of the GEMS Landfill Site in general, or the radionuclide component in particular, will pose any measurable risk to the residents of Gloucester Township or of Camden where the regional treatment plant is located. The parties agree that the radionuclides will be carefully monitored much like any other contaminant of waste, to assure that the GTMUA and CCMUA systems and the environment are not harmed in any way. In addition, the parties, particularly the GTMUA, concurred at the motion hearing that the radionuclide issue does not present changed circumstances in the operation of the remedial waste treatment plan. (Hearing Tr. 5/15/03, at 4–8, 25–27, 44.)

■ The Court recognizes that it has the power to modify the Consent Decree due to changed circumstances, under its inherent authority, *see Sansom Comm. v. Lynn,* 735 F.2d 1535, 1538 n. 3 (3d Cir. 1984), *cert. denied,* 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 358 (1984) ("A court possesses inherent power to modify its consent decree.") (citing *Delaware Valley Citizens' Council v. Pennsylvania,* 674 F.2d 976, 980 (3d Cir.), *cert. denied,* 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982)), and under its express authority within the Consent Decree's terms. *See* Consent Decree, ¶ 62, Trust's App. Ex. A (the Court may provide "order, direction, and relief as may be necessary or appropriate for the construction or *modification of this Consent Decree,* or to effectuate or enforce compliance with its terms") (emphasis added). No party moved for a modification based on the presence of radionuclides in the groundwater in this instance, where the radionuclide levels have been demonstrated not to pose a risk to the CCMUA or the public at large.

The Trust is correct that the failure to operate the system allows untreated water at the GEMS Site to continue to migrate and contaminate the surrounding environment, as pointed out by the EPA in its July 9, 2002 Determination Letter, *see* Trust's App. H, at 2. Moreover, the eight-month pilot study of the treatment system confirms that the treated effluent meets all standards for discharge required by the CCMUA, *see* n. 3. The risk arising from further delay in implementing the selected remedy, and thus prolonging the status quo at the Landfill, far exceeds any risk of going forward after pre-treatment on-site, with careful and appropriate monitoring. Consideration of these factors, that the Trust has carried out its obligations under the Consent Decree in creating the GWE and the OSPT systems, that the radionuclide levels in the treated groundwater meet stringent drinking water standards

according to the cumulative data of the eight-month trial of the operating system, and the danger that the untreated landfill water poses to the community and environment if nothing is done, favors going forward and seeking a renewed discharge permit from the CCMUA to implement the selected remedy in the Consent Decree.

B. *Enforcing the Sewer Service Agreement*

The GTMUA opposes the Trust's motion, however, on grounds that the Trust materially breached the Sewer Agreement by violating certain provisions.[11] The Sewer Agreement, mentioned above, provides for the GTMUA to be discharged as a named defendant in the GEMS litigation, and for it to receive a $400,000 one-time connection fee and annual user fees from the Trust, in exchange for the Trust to receive the right to discharge wastewater from its treatment facility through the GTMUA sewage collection system. *See* Sewer Agreement, Trust's App. Ex. B.

█ First, the GTMUA argues that the Trust did not carry out its obligation to provide the GTMUA with drawings and specifications of the OSPT and GWE within the 12–month time frame required by Paragraph 2 of the Sewer Agreement, which provides:

> Upon submission of a proper and complete application by the Trust to the Authority pursuant to N.J.S.A. 40:14B–

61, the Authority hereby agrees to approve the connection into its sewage collection system of the pre-treatment wastewater facility to be located at the GEMS Landfill. The Trust shall submit said application together with final plans and specification to the Authority within 12 months of the entry of the Consent Decree and construction of the on-site facility must be commenced within twenty-four (24) months from EPA approval of the remedial design, or such other time as agreed to by the parties; otherwise, this Agreement shall terminate and be of no further legal effect.

Sewer Agreement, ¶ 2, Trust's App. Ex. B. Rather, the Trust sent to the GTMUA the plans, drawings and specifications of the connection point between GEMS Landfill and the GTMUA's sewage collection system in March 1998, while the plans, specifications and drawings of the OSPT were sent to the GTMUA in April 2003. *See* Benson Letter, 4/2/03, Trust App. Ex. R.

█ The Trust argues, however, that the breach, if any, occurred in 1998, and that the GTMUA's acceptance of the Trust's second portion of the $400,000 user connection fee, therefore failed to seek rescission of the contract in a timely manner. Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement. *See Gar-*

---

11. The GTMUA originally notified the Trust of its concern of the radionuclide issue in a letter in May 2002, requesting over $6 million to upgrade and maintain the GTMUA's sewer system in light of what it believed to be the discharge of untreated radionuclides into its sewer system. *See* Long Letter, 5/28/02, Trust's App. Ex. G. The Trust responded that the GEMS on-site pre-treatment system had achieved "steady state" and that the system as designed, with the addition of a solids removal component, removes radionuclides to levels below that detected in drinking water. *See* Lesneski Letter, 12/27/02, Trust's App. Ex. K. The Trust then asked for confirmation that the GTMUA would not interfere with the flow of the discharge through the CCMUA, *id.,* but the GTMUA did not respond, until a status conference with the Court, at which time the GTMUA had taken the new position that the Trust had breached their Sewer Agreement by not providing it with drawings, plans and specifications of the OSPT, as required under Paragraph 2.

*den State Bldgs. v. First Fidelity Bank,* 305 N.J.Super. 510, 524, 702 A.2d 1315 (App.Div.1997), *certif. denied,* 153 N.J. 50, 707 A.2d 153 (1998) (citing *Ballantyne House Assocs. v. City of Newark,* 269 N.J.Super. 322, 334, 635 A.2d 551 (App. Div.1993)). *See also Dover Shopping Center, Inc. v. Cushman's Sons, Inc.,* 63 N.J.Super. 384, 164 A.2d 785 (App.Div. 1960) ("When a party treats a contract as valid and subsisting, he has made an election which prevents him from later seeking its rescission.") (citing 3 Williston on Contracts § 683, at 1970).

Here, the GTMUA did not raise the Trust's alleged material breach at any time prior to having requested and accepted the Trust's second portion of the connection user fee of $400,000 in exchange for the issuance of the discharge permit. The GTMUA could have asserted material breach at the time of the breach and taken action to compel compliance with the alleged breaches, such as notifying the Trust of the issue, but instead opted to perform by accepting the Trust's payment of the connection fee. By its actions, the GTMUA elected to treat the Sewer Agreement as valid and binding, and its argument regarding some preceding breach of contract therefore fails. The Court finds as a matter of law that no material breach of the Sewer Agreement has occurred in regard to providing specifications, plans and drawings of the OSPT system to the GTMUA.

■ The GTMUA's additional arguments that the Trust violated Paragraphs 14, 20 and 22 of the Sewer Agreement also lack merit. GTMUA contends that the Trust violated Paragraph 14, which requires the Trust to provide "as-built drawings of the OSPT facility" to the GTMUA. Here, because the design and construction of the permanent solids handling equipment is in process, the final treatment system has not yet been fully completed, and thus no final sealed "as-built" plans have been completed. There has thus been no opportunity for the Trust to provide the GTMUA with any "as-built drawings" as of yet. The Court finds as a matter of law that the Trust has not breached the Sewer Agreement in this regard.

■ The GTMUA also argues that the Trust breached the Sewer Agreement because it failed to provide the Authority with OSHA and Right to Know information under Paragraph 22 of the Sewer Agreement. *See* GTMUA's Br. at 5. Because the GTMUA fails to specify what OSHA or Right to Know information the Trust has failed to provide, and the Court is aware of none, this argument is unsubstantiated.

■ The GTMUA also contends that the Trust violated Paragraph 20 by not filing its insurance coverage with the GTMUA. That paragraph provides that

> The Trust shall also use its best efforts to provide and maintain the same insurance coverage following construction and prior to start-up operation of the on-site system, which shall be continued for so long as this Agreement remains in effect. In the event such insurance is obtained, continued wilful failure to then maintain such insurance coverage shall be cause for immediate termination of this Agreement and the cessation of any wastewater flow and discharge from the GEMS Landfill into the Authority Sewerage Collection System.

Sewer Agreement, ¶ 20, Trust's App. Ex. B. By its terms, nothing in the paragraph requires the Trust to provide the GTMUA with proof of insurance coverage. The language merely requires the Trust to use its best efforts to continue to maintain such insurance. There is no dispute that the Trust has used its best efforts in this case. Again, the Trust has complied with its obligations to the GTMUA.

In addition, the Trust's argument that the alleged breach is not material is persuasive, as the GTMUA has already received all the benefits due to it under the Agreement. Under New Jersey law, "if one party fails to perform essential obligations under the contract, he may be considered to have committed a material breach and the other party may elect to terminate." *Medivox Prods., Inc. v. Hoffmann–LaRoche, Inc.,* 107 N.J.Super. 47, 59, 256 A.2d 803 (Law Div.1969) (J. Handler) (citing *Frank Stamato & Co. v. Lodi,* 4 N.J. 14, 21, 71 A.2d 336 (1950)). Where a contract calls for a series of acts over a long term, a breach will be "material" if it tends to "defeat the purpose of the contract." *Medivox,* 107 N.J.Super. at 59, 256 A.2d 803 (citing *Winfield Mut. Hous. Corp. v. Middlesex Concrete Prods. & Excavating Corp.,* 39 N.J.Super. 92, 102, 120 A.2d 655 (App.Div.1956)). In this case, the GTMUA has received the $400,000 one-time connection fee, and future receipt of annual fees is expected. On the other hand, the Trust has not received any of the benefit from the Agreement because the discharge of its wastewater has not yet commenced. The alleged breaches by the Trust, including failing to send OSPT drawings and specifications according to the Agreement, do not defeat the purpose of the Sewer Agreement, where the GTMUA has already received it benefits and has been discharged as a defendant in this litigation.

That the alleged breach is not material is further demonstrated by the GTMUA's letter of March 24, 1999, attaching its Certification for Approval of the permit application and requesting the second installment of the Trust's payment to it, which responded to the Trust's permit application of March 10, 1998. In the Certification for Approval of the permit, the GTMUA supports the Trust's compliance with the parties' Sewer Agreement:

I hereby certify that the sewerage project identified above has been inspected, and tested under my supervision. Construction was witnessed as required in the specifications. The project was constructed in substantial·conformance with approved plans and specifications. Any exceptions to the approved plans and specifications are attached hereto with the approval of the owner.[12]

Certification, Trust's App. Ex. L. After studying the system, the GTMUA granted permit approval for the discharge to travel through its 6½ mile pipeline before entering into the CCMUA system. Thus, the GTMUA examined the Trust's application thoroughly, found the application to be satisfactory, issued the permit to the Trust, and received payment of the remainder of the $400,000 connection fee. Accordingly, it cannot be said that the Trust's alleged breach in failing to provide the OSPT drawings and specifications somehow defeated the purpose of contracting for the discharge through GTMUA's pipeline. They have been provided, in any event, and GTMUA has articulated no basis in which they are deficient. The GTMUA will be held to its agreement with the Trust.

It is clear, from all indications, that the remedy contained within the Consent Decree, as selected by the EPA, must be implemented. Under CERCLA, once a Consent Decree containing a specific remedy is entered by the federal court, neither the parties themselves, the non-parties, nor the Court can alter that remedy, absent a modification of the Consent Decree

---

12. As the Trust also argued at the motion hearing, the GTMUA's certification that the Trust sufficiently performed according to the terms of the Sewer Agreement is further indication that the breach is likely not material.

itself. *See, e.g., State of Missouri v. Indep. Petro Chem. Corp.,* 104 F.3d 159, 161 (8th Cir.1997) (rejecting county's attempt to alter emissions standard in consent decree under CERCLA by inserting more restrictive language into the air permit to comply with county ordinance); *see also Clinton County Comm'rs v. USEPA,* 116 F.3d 1018, 1022 (3d Cir.1997) (citizen suits challenging the remedy selected are expressly precluded "until such actions are complete, regardless of the harm that the actions might allegedly cause"), *cert. denied,* 522 U.S. 1045, 118 S.Ct. 687, 139 L.Ed.2d 633 (1998); *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1454–55 (6th Cir.1991) ("[T]he language of CERCLA and the legislative history of that act indicate that once the consent decree is entered by a federal court— giving the decree the force of law—alternative state remedies may not be pursued.") (citing 42 U.S.C. § 9621(f)).

Here, no party has applied to the Court for modification of the consent decree, which implements the EPA-selected remedy of requiring the discharge of pretreated effluent from the landfill to CCMUA. Moreover, as the Trust correctly points out, with there being no dispute that the radionuclides are treated on site and pose no risk to the surrounding environment, there exists no basis to alter the remedy described in the Consent Decree. Accordingly, based on the above reasons, the Trust's motion to enforce the Consent Decree and the Sewer Service Agreement will be granted.

## III. *CONCLUSION*

In conclusion, the parties agree that the presence of radionuclides in the effluent from the GEMS Landfill no longer presents a risk of harm to the human environment because its levels meet the most stringent drinking water standards for radionuclides. The eight-month study evaluating the effluent from the GEMS Landfill confirms this finding, and supports the enforcement of the Consent Decree entered into by the parties and signed by the Court on June 27, 1997, requiring for the remedy of on-site pre-treatment of the water before being discharged to the CCMUA sewer system, via GTMUA's pipelines. There is nothing peculiar about the GEMS Landfill's pre-treated effluent water when compared with the waste stream processed safely every day by the CCMUA. GTMUA's arguments that the Trust has materially breached the Sewer Agreement are unfounded, as are its claims of deterioration of the collector line, and thus provide no reason for delaying the remedy contained in the Consent Decree. The Trust's motion to enforce the Consent Decree and the Sewer Agreement will be granted, and the NJDEP and the CCMUA will be directed to draft an appropriate proposed permit for the CCMUA's receipt of the pretreated effluent within thirty (30) days of today's date, subject to the procedures for public notice and comment. The Sewer Agreement shall be enforced, and the GTMUA will be ordered to comply with its obligations under the Sewer Agreement and to cease and desist from its threats to block the connection between the GEMS treatment system and the GTMUA's sewage collection system due to any alleged past breach or change of conditions.

The Court retains supervisory authority to enforce the Consent Decree and this Order, and remains available to the parties if any further issues arise. To assure compliance, the Court will convene a hearing at the expiration of the thirty (30) days, on Monday, June 30, 2003 at 1:00 P.M.

The accompanying Order will be entered.

## ORDER

THIS MATTER having come before the Court upon the Trust's motion to enforce the Consent Decree; and the Court having reviewed the parties' submissions; and the parties having presented oral argument before the Court at a hearing convened on May 15, 2003; and for the reasons given in the Opinion of today's date; and for good cause shown;

IT IS on this ___ day of May, 2003, hereby

ORDERED that the Trust's motion to enforce the Consent Decree shall be, and hereby is, *GRANTED*; and it is

FURTHER ORDERED that the NJDEP and the CCMUA are hereby directed to cooperate in finalizing the CCMUA's proposed draft discharge permit within thirty (30) days of today's date; and

IT IS FURTHER ORDERED that the GTMUA shall comply with its obligations under the Sewer Agreement and shall cease and desist from its threats to block the connection between the GEMS treatment system and the GTMUA's sewage collection system; and

IT IS FURTHER ORDERED that counsel appear at a status conference to be convened at the expiration of the 30–day period, on *Monday, June 30, 2003, at 1:00 P.M. in Courtroom 4A.*